# EXHIBIT A

*EXECUTION VERSION*

## EQUITY PURCHASE AGREEMENT

This Equity Purchase Agreement (this "**Agreement**") is made and entered into as of February 29, 2024, by and among (i) Kappa Graphics, LLC, a Delaware limited liability company ("**Kappa Graphics**"), (ii) Kappa Product Fulfillment Services, LLC, a Pennsylvania limited liability company ("**KPFS**" and together with Kappa Graphics, the "**Company**"), (iii) KGR Holdings, LLC, a Pennsylvania limited liability company ("**Kappa Graphics Holdco**"), as a seller and as the representative of the Sellers (in such capacity as the representative of the Sellers, the "**Sellers' Representative**"), (iv) KPF Holdings, LLC, a Pennsylvania limited liability company ("**KPFS Holdco**", and together with Kappa Graphics Holdco, each a "**Seller**", and collectively, the "**Sellers**"), (v) JAL Equity Corp, a Nevada corporation (the "**Buyer**"), and (vi) solely for purposes of <u>Section 5.1</u> and <u>Section 5.5</u>, the estate of Nicholas Karabots ("**Owner**").

### Introduction

Kappa Graphics Holdco owns all of the issued and outstanding equity interests of Kappa Graphics (the "**KG Equity**") and KPFS Holdco owns all of the issued and outstanding equity interests of KPFS (the "**KPFS Equity**" and together with the KG Equity, the "**Equity Interests**"). The Buyer desires to purchase from the Sellers, and the Sellers desire to sell to the Buyer, all of the Equity Interests on the terms and conditions set forth in this Agreement.

The Owner beneficially owns, directly and indirectly, eighty percent (80%) of the issued and outstanding equity interests of each of the Sellers. The Owner derives a direct and indirect benefit from this Agreement and will receive substantial consideration with respect to its indirect ownership in the Company.

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## PURCHASE AND SALE; CLOSING

**1.1** **Purchase and Sale**. Subject to the terms and conditions of this Agreement, at the Closing, the Sellers shall sell, transfer, assign and deliver to the Buyer, and the Buyer shall purchase and acquire from the Sellers, all of the Equity Interests (the "**Purchased Securities**"), free and clear of all Liens, other than restrictions on transfer under applicable securities laws. The purchase and sale of the Purchased Securities and the other transactions contemplated hereby and by the other Transaction Documents (as defined below) are sometimes collectively referred to herein as the "**Transactions**."

**1.2** **Closing**. The closing of the Transactions (the "**Closing**") will take place remotely, via electronic exchange of documents and signature pages simultaneously with the execution hereof on the date hereof (the "**Closing Date**"). The Closing shall be effective as of the close of business on the Closing Date.

**1.3** **Certain Definitions; Pre-Closing Deliveries**.

    **(a)** **Certain Definitions**. As used herein, the following terms shall have the following meanings:

        "**ACA**" means the Patient Protection and Affordable Care Act of 2010, as amended, and regulations promulgated thereunder.

"**Accounting Principles**" means GAAP, subject to the same accounting methods, practices, policies and principles (including classification and estimation methodologies) used by the Company to prepare its most recent audited financial statements referenced in Section 2.8 (provided that such methods, practices, policies and principles are in accordance with GAAP or otherwise set forth on **Schedule 2.8**) and without giving effect to the Transactions or any purchase accounting arising from the consummation of the Transactions.

"**Adjusted Heidelberg Liability**" means if the aggregate of all Heidelberg Costs and Expenses, including all amounts paid by the Sellers or the Company prior to Closing, (a) exceed $650,000, then $650,000, (ii) are less than $600,000, then $600,000, or (iii) exceed $600,000 but are less than $650,000, then the actual aggregate amount of such Heidelberg Costs and Expenses (e.g., if the aggregate Heidelberg Costs and Expenses are $675,000, then the Adjusted Heidelberg Liability shall be $650,000, if the aggregate Heidelberg Costs and Expenses are $575,000, then the Adjusted Heidelberg Liability shall be $600,000, and if the aggregate Heidelberg Costs and Expenses are $625,000, then the Adjusted Heidelberg Liability shall be $625,000).

"**Affiliate**" of a specified Person means any other Person that, directly or indirectly, controls, is controlled by, or is under common control with, such specified Person. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with") means and shall include: (i) the ownership of fifty percent (50%) or more of the voting securities or other voting interests of a Person or (ii) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract, as an officer or director, or otherwise.

"**Assumed MEPP Liability**" means Kappa Graphics' obligations under the Graphic Communications National Pension Fund (fka GCC/IBT National Pension Fund), for Kappa Graphics, LP (M2410002), and which for purposes of this Agreement shall be calculated at One Million Five Hundred Thousand Dollars ($1,500,000). For the sake of clarity, this amount is meant as an adjustment to the Purchase Price but does not purport to absolve the Buyer for any withdrawal liability that may be triggered after the Closing with respect to the Multiemployer Plans disclosed on **Schedule 2.19(k)**.

"**Base Purchase Price**" means Three Million Four Hundred Thousand Dollars ($3,400,000).

"**Business**" means the business of commercial printing, fulfillment, and mailing conducted by the Company, prior to the date hereof, and all other business activities, operations, and practices of the Company, as such business activities, operations, and practices are conducted by the Company on the date hereof.

"**Buyer**" has the meaning set forth in the Preamble.

"**CARES Act**" means the U.S. Coronavirus Aid, Relief and Economic Security Act of 2020 (Public Law 116-136).

"**Closing Cash**" means as of immediately prior to the Closing, the consolidated cash of the Company as determined in accordance with the Accounting Principles; *provided*, however, that all "cut" but uncashed checks and pending electronic funds transfers authorized by the Company (in each case to the extent also removed from accounts payable) will be reflected as a reduction to Closing Cash, but only to the extent not already deducted.

"**Closing Indebtedness**" means the Indebtedness of the Company as of immediately prior to the Closing. Closing Indebtedness shall be determined in accordance with the Accounting Principles.

"**Closing Net Working Capital**" means an amount equal to the current assets of the Company less the current liabilities of the Company, each as calculated in accordance with the Accounting Principles; *provided*, that Closing Net Working Capital shall exclude any and all Closing Cash, Transaction Expenses and Closing Indebtedness. A sample Closing Net Working Capital calculation is set forth on **Exhibit A** hereto.

"**COBRA**" means the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, and regulations promulgated thereunder.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the Preamble.

"**Company Data**" means all data and information, including Personal Information, Processed in the conduct of by or on behalf of the Company or in the Business.

"**Company IT Systems**" means all computers, devices, equipment, networks, systems, and other information technology infrastructure, including all software operating thereon or in connection therewith, used or held for use by the Company or in the conduct of its Business or the Processing of Company Data by or on behalf of the Company.

"**Company Material Adverse Effect**" means any event, occurrence, development or circumstance that, individually or in the aggregate, has or would reasonably be expected to have a material adverse effect on the assets, liabilities, properties or financial condition of the Business or the Company taken as a whole; *provided*, that in no event shall any of the following be taken into account in the determination of whether a Company Material Adverse Effect has occurred: (i) any change in any Legal Requirement or GAAP, but only to the extent that such change does not have and would not be reasonably likely to have a disproportionately adverse effect on the Business or the Company as compared to other similarly-situated businesses in the same industry; (ii) any change resulting from conditions affecting any of the industries in which the Business or the Company operates, but only to the extent that such change does not have and would not be reasonably likely to have a disproportionately adverse effect on the Business or the Company as compared to other similarly-situated businesses in the same industry; (iii) any change resulting from changes in general business, financial, political, capital market or economic conditions (including any change resulting from any calamity, natural disaster, hostilities, war or military or terrorist attack), but only to the extent that such change does not have and would not be reasonably likely to have a disproportionately adverse effect on the Business or the Company as compared to other similarly-situated businesses in the same industry; or (iv) the failure of the Business or the Company to achieve any financial projections or budget (it being understood that the fact or occurrences giving rise to such failure may be taken into account in determining whether there has been a Company Material Adverse Effect so long as such facts or occurrences are not otherwise excluded by any other clause in this definition).

"**Company Software**" means all Software of any type owned or purported to be owned by the Company or Software used or held for use in the operation of the Business or otherwise used or held for use by the Company.

"**Contract**" means any contract, agreement, lease, license, indenture, mortgage, deed of trust, evidence of indebtedness, binding commitment or instrument, or binding purchase order, whether written or oral.

"**Employee**" means any employee of or individual contractor or consultant to the Company (whether salaried or hourly, and full-time or part-time), whether or not actively working for the Company on the Closing Date (e.g., including employees on vacation and leave of absence, including maternity, family, sick, military or disability leave) and whether employed or engaged directly by the Company or indirectly through a professional employer organization, staffing agency, employee leasing company or other similar arrangement.

"**Employee Plan**" means other than a Multiemployer Plan: (i) any agreement, arrangement, plan, or policy, whether or not written and whether or not considered legally binding, that involves (A) any pension, retirement, profit sharing, savings, deferred compensation, bonus, stock option, simple retirement account (as described in Section 408(p) of the Code), stock purchase, phantom stock, equity or equity-based, health, welfare, change-in-control, or incentive plan; or (B) welfare or "fringe" benefits, including without limitation vacation, holiday, severance, disability, medical, hospitalization, dental, life and other insurance, tuition, company car, club dues, sick leave, maternity, paternity or family leave, health care reimbursement, dependent care assistance, Section 125 cafeteria plan, or other benefits; or (ii) any employment, consulting, engagement, retainer, or golden parachute agreement or arrangement, in each case, which is sponsored, maintained or contributed to by the Company or any ERISA Affiliate or with respect to which the Company has or may have any current or future liability.

"**Equity Interests**" has the meaning set forth in the Introduction.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

"**ERISA Affiliate**" means, with respect to any corporation or trade or business, any other corporation or trade or business that is, or was at the relevant time, a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA that includes or included the Company, or that is, or was at the relevant time, a member of the same "controlled group" as the Company pursuant to Section 4001(a)(14) of ERISA.

"**Estimated Purchase Price**" means the Base Purchase Price, (i) *plus* an amount equal to the Estimated Closing Cash of $0, (ii) *minus* the amount of Estimated Closing Indebtedness, (iii) plus the Initial Net Working Capital Adjustment Amount, (iv) *minus* the Assumed MEPP Liability, (v) *minus* the Estimated Heidelberg Liability (v) *minus* the amount of the Estimated Transaction Expenses.

"**Final Purchase Price**" means the Purchase Price, as finally determined after the Closing pursuant to Section 1.5 based on the Final Closing Cash, the Final Closing Indebtedness, the Final Closing Net Working Capital, the Final Transaction Expenses, and the Final Heidelberg Liability.

"**Fraud**" means common law fraud.

"**GAAP**" means United States generally accepted accounting principles, consistently applied.

"**Governmental Approval**" means any consent, approval, authorization, declaration, waiver, license, franchise, permit, certificate or order of any Governmental Authority.

"**Governmental Authority**" means any: (i) foreign, federal, state, provincial, municipal or local government, court, tribunal, administrative agency or department, (ii) any other governmental, government appointed or regulatory authority or (iii) quasi-governmental authority exercising any regulatory, expropriation or taxing authority under or for the account of any of the above.

"**Heidelberg Costs and Expenses**" means all costs and expenses incurred to purchase and make operational the Heidelberg Press, including but not limited to the cost of the Press and all costs to install and make the Press operational, including but not limited to the press site borings, press pads, press pad work construction, rigging, electrical power runs and panels, installation of all air requirements, installation of all ink line requirements, installation of remote inking, installation of stacker/palletizer, roll transit, environmental review, and stackers.

"**Heidelberg Liability**" means Six Hundred Fifty Thousand Dollars ($650,000), less the amount of Closing Indebtedness paid by Buyer to Glendi Publications Inc. at Closing pursuant to a payoff letter delivered by Sellers to Buyer prior to Closing up to a maximum amount of Three Hundred Two Thousand Seven Hundred Sixteen Dollars ($302,716).

"**Heidelberg Press**" means that certain 2004 Heidelberg Mercury (2) Tower (4) Web Press System purchased by Kappa Graphics, L.P. pursuant to that certain Used Equipment Sales Agreement, dated November 9, 2023, by and between Machinery Solutions Group, Inc. and Kappa Graphics.

"**HIPAA**" means the Health Insurance Portability and Accountability Act of 1996, as amended, and regulations promulgated thereunder.

"**Holdback Amount**" means Seven Hundred Thousand Dollars ($700,000).

"**Income Tax**" shall mean any Tax imposed upon or measured by net income or gross income (excluding any Tax based solely on gross receipts).

"**Income Tax Return**" shall mean any Tax Return filed or required to be filed with respect to Income Taxes.

"**Indebtedness**" means, at any time without duplication of amounts:  (i) all outstanding payment obligations of the Company for borrowed money; (ii) all outstanding payment obligations of the Company evidenced by bonds, debentures, notes or other similar instruments; (iii) all outstanding indebtedness of the Company in respect of letters of credit (to the extent drawn) or similar facilities; (iv) all obligations of the Company for the deferred purchase price of property, assets or services or for earnouts, holdbacks of purchase price, non-compete payments, obligations to pay purchase price adjustments or other similar obligations (calculated assuming the achievement and/or satisfaction of all applicable targets, thresholds and other terms and conditions of the same); (v) surety bonds or keep-well obligations of the Company; (vi) that portion of obligations with respect to capital leases that is properly classified as a liability on a balance sheet in conformity with GAAP; (vii) all liabilities and obligations of the Company owed to the Sellers or any of their respective Affiliates, including all dividends and distributions payable to the Sellers; (viii) all obligations under any interest rate or currency protection agreement or similar hedging agreement of the Company, assuming such agreements were terminated *minus* any amounts

- 5 -

payable to the Company in connection with such termination (which may be a positive or negative number); (ix) all unfunded liabilities relating to severance payments, deferred compensation, phantom equity, or similar arrangements (including all applicable Taxes required to be deducted or withheld, and the employer's share of employment taxes) to the extent not otherwise taken into account in the calculation of the Purchase Price; (x) all outstanding indebtedness of the Company in respect of any guaranty of indebtedness of another Person; (xi) any obligations of another Person secured by a Lien on the assets of the Company; (xii) unpaid Pre-Closing Taxes to the extent not otherwise taken into account in the calculation of the Purchase Price; (xiii) all deferred revenue and customer postage deposits; and (xiv) all interest, any premiums payable or any other costs or charges (including any prepayment penalties, termination fees, breakage costs, make-whole and expense reimbursements) on any instruments or obligations described in clauses (i) through (xii) hereof, all as the same may be payable upon the complete and final payoff thereof, regardless of whether such payoff occurs prior to, simultaneous with or following the Closing, in each case determined as of and after giving effect to the Closing in accordance with this Agreement. Notwithstanding any term herein to the contrary, in no event will the Closing Indebtedness include (x) any indebtedness arranged by the Buyer or any of its Affiliates following the Closing; (y) the Assumed MEPP Liability; or (z) the Heidelberg Liability.

"**Information Requirements**" means all of the following, applicable to or binding upon the Sellers or the Company, concerning the confidentiality, nondisclosure, privacy, or security of data or information or the Processing thereof: (a) Legal Requirements; (b) policies and procedures; (c) Contracts; (d) permissions, consents and authorizations applicable to the Processing of Company Data; (e) rules of self-regulatory organizations; or (f) published industry standards.

"**Initial Net Working Capital Adjustment Amount**" which may be positive, negative, or $0, means (i) if the Estimated Closing Net Working Capital is greater than the Upper Collar, then the Estimated Closing Net Working Capital minus the Upper Collar, (ii) if the Estimated Closing Net Working Capital is less than the Lower Collar, then the Estimated Closing Net Working Capital minus the Lower Collar, or (iii) if the Estimated Closing Net Working Capital is between the Upper Collar and the Lower Collar, then $0.

"**IRS**" means the Internal Revenue Service.

"**JAL Affiliates**" means the Affiliates of the Company as of the day after the Closing Date, including the Buyer, that are engaged in the printing business.

"**Legal Proceeding**" means any suit, claim, action, litigation, arbitration, mediation or proceeding (including any civil, criminal, administrative, investigative or appellate proceeding) commenced before any court, arbitrator, mediator or Governmental Authority.

"**Legal Requirements**" means all foreign, federal, state and local statutes, laws, ordinances, judgments, decrees, rules, directives, and orders and all governmental rules and regulations of any Governmental Authority.

"**Liability**" or "**Liabilities**" means all debts, adverse claims, liabilities and/or obligations, direct, indirect, absolute or contingent, whether accrued, vested or otherwise and whether or not reflected or required to be reflected on the financial statements of a Person.

"**Lien**" means any lien, security interest, charge, pledge, restriction, adverse claim, mortgage, option or other similar encumbrance of any kind.

"**Lower Collar**" means One Million Five Hundred Thousand Dollars ($1,500,000).

"**Malicious Code**" means software designed to disable any other software or any computer or system automatically, with the passage of time, under the positive control of any Person, or otherwise, including any back door, time bomb, drop dead device or similar software, or any software enabling unauthorized access to or operation of any other Software or any computer or system, including any virus, trojan horse, worm, or other similar software.

"**Multiemployer Plan**" means a multiemployer plan as defined in Section 3(37) of ERISA.

"**Non-Party**" means any Person that is not expressly identified as a party to this Agreement or otherwise bound to certain provisions of this Agreement, including any former, current or future stockholders, equity holders, controlling persons, financing source, directors, officers, employees, general or limited partners, members, managers, agents or Affiliates of any party hereto (in each case, that is not otherwise a party hereto), or any former, current or future direct or indirect stockholder, equity holder, controlling person, director, officer, employee, general or limited partner, member, manager, agent or Affiliate of any of the foregoing.

"**Ordinary Course**" means only the ordinary course of commercial operations customarily engaged in by the Sellers and their respective Affiliates with respect to the Company and the Business and by the Company, in each case consistent with past practices and specifically does not include (i) any activity involving the purchase or sale of the Equity Interests, the Company or the Business or of any material assets, product line or business unit thereof, or (ii) the incurrence of any Liability for any tort or any breach or violation of or any default under any Contract, Permit or Legal Requirements.

"**Organizational Documents**" means with respect to an entity, the certificate of incorporation, articles of incorporation, certificate of formation, bylaws, partnership agreement, limited liability company agreement, operating agreement, formation agreement, joint venture agreement and other similar organizational documents of such entity (in each case, as in effect on the date of this Agreement unless otherwise noted herein).

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Permit**" means a license, permit, franchise, certification, approval, clearance or other authorization or registration of any Governmental Authority.

"**Permitted Liens**" means (a) such non-monetary imperfections of title, easements, encumbrances, liens or restrictions of record that, individually or in the aggregate, do not materially impair the current use, value or marketability of the Company's assets that are subject thereto, in each case, that have not been breached, violated, or encroached upon by the Company; (b) materialmen's, mechanics', carriers', workmen's, warehousemen's, repairmen's, landlord's and other similar Liens arising in the Ordinary Course for amounts not yet due and payable; (c) Liens for Taxes not yet due and payable; and (d) with respect to any Leased Real Property, Liens encumbering the landlord's interest in such Leased Real Property.

"**Person**" means any natural person, corporation, limited liability company, partnership, trust, Governmental Authority or other entity.

"**Personal Information**" means any (a) personal information, personal data, personally identifiable information, or other similar or analogous terms of a natural Person defined under any Information Requirements or other applicable Legal Requirements, or (b) data or information that, directly or indirectly, alone or in combination with any other data or information, could be used to reasonably identify a natural Person.

"**Potential Payment**" means a potential aggregate, maximum amount of (i) in the event that the Buyer or an Affiliate of the Buyer acquires a substantial portion of the assets of Craftline Graphics, Inc. and Craftline Fulfillment & Distribution, LLC (the "**Craftline Entities**") within two (2) months of the Closing Date, One Million Dollars ($1,000,000), or (ii) in the event that neither the Buyer nor an Affiliate of the Buyer acquires a substantial portion of the assets of the Craftline Entities within two (2) months of the Closing Date, Six Hundred Thousand Dollars ($600,000).

"**Pre-Closing Tax Period**" means any taxable period ending on or prior to the Closing Date.

"**Pre-Closing Taxes**" means the Company's Taxes or its liability, if any, for Taxes of others, including but not limited to the Sellers or any Affiliate of the Sellers, and any Taxes claimed or assessed against the Buyer with respect to the Company or the Business (i) for any Pre-Closing Tax Period, (ii) that are allocable to the portion of any Straddle Period ending on (and including) the Closing Date (as determined pursuant to Section 5.2(b)(iii), as applicable), and (iii) as a result of the transactions contemplated by this Agreement, including those Taxes for which the Sellers are responsible pursuant to Section 5.2(d).

"**Process**" means collect, process, use, analyze, disclose, distribute, make available, transfer, transmit, store, retain, host, manage, control, secure, dispose of, or otherwise handle. "**Processing**" and "**Processed**" shall have analogous meanings.

"**Purchase Price**" means the Base Purchase Price, (i) *plus* an amount equal to the Closing Cash, (ii) *minus* the amount of Closing Indebtedness, (iii) plus the amount by which the Closing Net Working Capital is greater than the Upper Collar or *minus* the amount by which the Closing Net Working Capital is less than the Lower Collar or plus $0 if the Closing Net Working Capital is between the Upper Collar and the Lower Collar, (iv) *minus* the Assumed MEPP Liability, (v) *minus* the Adjusted Heidelberg Liability, (vi) *minus* the amount of the Transaction Expenses.

"**Reference Date**" means January 1, 2021.

"**Security Incident**" means any suspected or actual breach of security, violation of any security policy, or unauthorized access, acquisition, use, loss, denial or loss of use, destruction, compromise, or disclosure of any Company IT Systems or Company Data.

"**Seller**" has the meaning set forth in the Preamble.

"**Software**" means all computer software of any kind, in any form (including source code, object code or other form), format or programming language, including all programs, applications, routines, interfaces, libraries, modules, systems, databases, tools, algorithms, firmware, protocols and files, all versions, updates, upgrades, corrections, enhancements, replacements and modifications of or to any of the foregoing, all technical and other specifications related to any of the foregoing, and all user, technical, support, training and other documentation ("**Documentation**") related thereto.

"**Straddle Period**" means any taxable period beginning on or prior to the Closing Date and ending after the Closing Date.

"**Tax**" or "**Taxes**" means any taxes, charges, fees, duties, levies, or other like assessments, including without limitation any federal, state, local or non-U.S. (or any political subdivision of any of the foregoing) income, gross receipts, ad valorem, value added, alternative minimum, premium, stamp, employment, excise, severance, real property, personal property, windfall profit, sales, use, transfer, license, unclaimed property and escheat, capital stock, profits, withholding, social security, payroll, unemployment, disability, environmental, customs, duties, franchise, estimated or other tax of any kind whatsoever imposed by any Governmental Authority (including any interest, fines, penalties, assessments, or additions thereto) whether disputed or not, and including any obligations to indemnify or otherwise assume or succeed to the Tax liability of any other Person, including by contract or otherwise.

"**Tax Returns**" means all returns, reports, estimates, declarations of estimated Tax, information statements, elections, statements of foreign bank and financial accounts, and other documents relating to, filed, or required to be filed in connection with, any Taxes and any schedules thereto or amendments thereof (including refund claims with respect thereto).

"**Total Consideration**" means the aggregate consideration payable by the Buyer to the Sellers in respect of the Purchased Securities, which equals the (i) Final Purchase Price, plus (ii) the Earn-Out Amount, if any, in each case subject to any adjustments as set forth herein.

"**Transaction Documents**" means collectively, this Agreement and each of the other agreements, certificates and documents required to be delivered in connection with the closing of the transactions contemplated hereby.

"**Transaction Expenses**" means, to the extent not paid by the Sellers prior to the Closing Date, the Company's obligations in respect of all expenses (including, but not limited to, all interest, late fees, and penalties related thereto) incurred by any of the Company, the Sellers or any Affiliate thereof in connection with the preparation, negotiation, and execution of this Agreement and the Transaction Documents and the consummation of the Transactions, including (i) the Company's obligations with respect to all unpaid fees and expenses of attorneys, accountants, investment bankers and other advisors of the Sellers and their respective Affiliates, including the Company, relating to the Transactions, and (ii) any other payment of any kind payable by the Company to management or employees, customers, vendors, or any other Person that is accelerated or triggered by or upon the entry into or consummation of the transactions contemplated by this Agreement (including all applicable Taxes required to be deducted or withheld, and the employer's share of employment Taxes, with respect to the foregoing), regardless of whether such payment is due, paid or payable prior to, on or after the Closing.  In no event, however, will any fees and expenses incurred by or for the account of the Buyer or any of its Affiliates (to avoid doubt, other than the Company prior to Closing), or any fees or expenses that are incurred by the Company after the Closing and not in any way accelerated or triggered by or resulting from the Closing, be considered Transaction Expenses.

"**Upper Collar**" means Two Million Two Hundred Fifty Thousand Dollars ($2,250,000).

(b)    **Pre-Closing Deliveries**.  At least two (2) business days prior to the Closing, the Company has furnished to the Buyer (i) a certificate (the "**Estimated Purchase Price Certificate**") setting forth (A) the Company's good faith estimate of each of the Closing Cash, Closing Indebtedness, Closing Net Working Capital Transaction Expenses, and Heidelberg Liability  (the "**Estimated Closing Cash**,"

"**Estimated Closing Indebtedness**," "**Estimated Closing Net Working Capital**," "**Estimated Transaction Expenses**," and "**Estimated Heidelberg Liability**" respectively) and (B) a calculation of the Estimated Purchase Price based thereon and the resulting Closing Payment, (ii) payoff letters (in form and substance satisfactory to the Buyer) executed by each holder of Closing Indebtedness described in clauses (i)-(iii), (vii), and (x) of the definition of Indebtedness, indicating the amount required to discharge in full such Indebtedness at the Closing, providing for the release of any Liens on assets of the Company upon repayment of such amount and including an undertaking by each such holder to discharge any Liens securing any portion of such Indebtedness or authorizing the Buyer or its designee to do so, and (iii) a statement from each payee of any portion of the Transaction Expenses described in clause (i) of the definition thereof certifying the amount owed to it by the Company and payment instructions therefor, and, as applicable, evidence satisfactory to the Buyer that all agreements between the Company and such party have been or will be upon Closing effectively terminated without penalty or further liability or obligation to the Company.

       **1.4**     **Payments At Closing**. At the Closing, the Buyer shall pay or cause to be paid to the respective holders of Closing Indebtedness who have delivered payoff letters pursuant to <u>Section 1.3(b)(ii)</u>, the amounts set forth in such payoff letters and shall subsequently make or cause to be made the following payments by wire transfer of immediately available funds:

       **(a)**     *first*, to the payees of the Transaction Expenses of the type described in clause (i) of the definition thereof, in accordance with the statements delivered by the Company to the Buyer pursuant to <u>Section 1.3(b)(iii)</u>; and

       **(b)**     *second*, the balance of the Estimated Purchase Price, after deducting the Holdback Amount, to the Sellers' *Representative* (for the benefit of the Sellers) (the "**Closing Payment**").

       **1.5**     **Determination of Final Purchase Price**.

       **(a)**     **Initial Determination**. Within ninety (90) days after the Closing Date, the Buyer will prepare in good faith and deliver to the Sellers' Representative a certificate (the "**Purchase Price Certificate**") executed by the Buyer setting forth (i) the Closing Cash, the Closing Indebtedness, the Closing Net Working Capital, the Transaction Expenses, and the Adjusted Heidelberg Liability and (ii) the Buyer's calculation of the Purchase Price based thereon. The Sellers' Representative shall reasonably assist the Buyer in the preparation of the Purchase Price Certificate.

       **(b)**     **Sellers' Right to Dispute**. If the Sellers' Representative delivers written notice (the "**Disputed Items Notice**") to the Buyer within thirty (30) days after receipt by the Sellers' Representative of the Purchase Price Certificate stating that the Sellers' Representative objects to any items in the Purchase Price Certificate (the "**Disputed Items**") and providing reasonable detail regarding the amount and basis for each objection, the Buyer and the Sellers' Representative will in good faith attempt to resolve and finally determine and agree upon the Disputed Items as promptly as practicable. If the Sellers' Representative *does not* deliver the Disputed Items Notice to the Buyer within thirty (30) days after receipt by the Sellers' Representative of the Purchase Price Certificate, the Sellers' Representative will be deemed to have accepted the Purchase Price Certificate (and all amounts and calculations set forth thereon, including the Purchase Price) in all respects, and the Purchase Price Certificate as originally delivered by the Buyer (and all such amounts and calculations, including the Purchase Price) will be final and binding on, and non-appealable by, the parties and the Purchase Price set forth therein shall be the Final Purchase Price.

       **(c)**     **Arbitration of Disputes**. If the Buyer and the Sellers' Representative fail to agree upon the Disputed Items within thirty (30) days after delivery of a timely Disputed Items Notice (or such

longer period as the Buyer and the Sellers' Representative may mutually agree), the Buyer and the Sellers' Representative will select an independent accounting firm reasonably acceptable to each of them (the "**Independent Accounting Firm**") to resolve the Disputed Items in accordance with the terms of this Agreement.  The Independent Accounting Firm shall act as an expert with respect to such dispute and shall address only the Disputed Items set forth in the Disputed Items Notice and the scope of the Independent Accounting Firm's review shall be limited to whether the Disputed Items were prepared in accordance with this Agreement, including the Accounting Principles.  The Independent Accounting Firm will (i) resolve the Disputed Items specified in the Disputed Items Notice and (ii) determine whether and to what extent the Purchase Price Certificate and the calculation of the Purchase Price based thereon requires adjustment.  The Independent Accounting Firm's determinations shall be final and binding on the parties, absent manifest error.  The Buyer and the Sellers' Representative will each have the same opportunity to present its position and submit materials regarding the Disputed Items to the Independent Accounting Firm and the Independent Accounting Firm's decision shall be based solely on such presentations and submissions and not by independent review.  No party hereto shall have any *ex parte* communications with the Independent Accounting Firm concerning the determination required to be made under this Section 1.5(c).  The Independent Accounting Firm shall address only the Disputed Items and may not assign a value greater than the greatest value claimed for such item by either party or smaller than the smallest value for such item claimed by either party, except to the extent impacted by the resolution of another Disputed Item.  The Buyer and the Sellers' Representative will instruct the Independent Accounting Firm to make a written determination of each Disputed Item within thirty (30) days after being selected and such determination will be final and binding on the parties.  The fees, costs and expenses of the Independent Accounting Firm shall be allocated between the Sellers' Representative, on the one hand, and the Buyer, on the other hand, in the same proportion that the aggregate amount of the Disputed Items submitted to the Independent Accounting Firm that is unsuccessfully disputed by each such party (as finally determined by the Independent Accounting Firm) bears to the total amount of Disputed Items so submitted; *provided*, that such fees, costs, and expenses shall not include, so long as a party complies with the procedures of this Section 1.5, the other party's outside counsel or accounting fees.

(d)    **Final Purchase Price**.  The Closing Cash, Closing Indebtedness, Closing Net Working Capital, Transaction Expenses, and Adjusted Heidelberg Liability each as set forth on the Purchase Price Certificate as finally determined in accordance with the terms of Section 1.5 (the "**Final Closing Certificate**"), shall be referred to as the "**Final Closing Cash**," "**Final Closing Indebtedness**," "**Final Net Working Capital**," "**Final Transaction Expenses**," and "**Final Heidelberg Liability**".

(e)    **Payment**.

(i)    After the determination of the Final Net Working Capital, the parties will review the amount of the adjustment at Closing with respect to the Estimated Closing Net Working Capital and the Final Net Working Capital, and determine what amount, if any, would be payable between the parties as a true up payment that accounts for the difference in such numbers but that will also ensure that the Buyer and the Sellers are in the economic position that they would have been if the Initial Net Working Capital Adjustment Amount had been calculated using the Closing Net Working Capital instead of the Estimated Closing Net Working Capital (such amount, the "**Final Closing Net Working Capital Adjustment Amount**"). For example, if the Estimated Net Working Capital was calculated to be $2,450,000, and the Buyer paid the Sellers, as part of the Closing Payment, such Initial Net Working Capital Adjustment Amount in the amount of $200,000, and the Closing Net Working Capital is determined to be $1,700,000, then the Final Closing Net Working Capital Adjustment Amount shall be $200,000 and payable by the Sellers (which may be paid by the Sellers' Representative on behalf of the Sellers, at the Sellers' direction) pursuant to Section 1.5(e)(ii) to the Buyer.

- 11 -

(ii)    In the event the difference between the Final Purchase Price and the Estimated Purchase Price is a positive number (taking into account any adjustments related to the Final Closing Net Working Capital Adjustment Amount), such amount will be payable to the Sellers' Representative (for the benefit of the Sellers) by the Buyer. In the event the difference between the Final Purchase Price and the Estimated Purchase Price is a negative number (taking into account any adjustments related to the Final Closing Net Working Capital Adjustment Amount), such amount will be payable to the Buyer by the Sellers (which may be paid by the Sellers' Representative on behalf of the Sellers, at the Sellers' direction). Any payment so required to be made pursuant to this Section 1.5(e) shall be made by transfer of immediately available funds not more than five (5) business days after final determination thereof.

(f)    **Access to Information**.  The Sellers' Representative and its accountants, lawyers and other representatives will be given reasonable access at all reasonable times to (and shall be allowed to make copies of) the books and records of the Buyer and the Company and to any personnel of the Buyer and the Company reasonably requested by such Persons, in each case in connection with the determination of the Purchase Price or any dispute relating thereto.

(g)    **Withholding**.  Notwithstanding any provision hereof to the contrary, the Buyer and the Company shall be entitled to deduct and withhold from any consideration otherwise payable under the terms of this Agreement such amounts as it is required to deduct and withhold pursuant to any provision of any Legal Requirement, including those related to or regarding Taxes.  It is the understanding of the Buyer, the Sellers and the Sellers' Representative under Tax law that no Taxes shall be required to be deducted or withheld from the payment of the Estimated Purchase Price (or from any subsequent payments) to the Sellers. To the extent that amounts are required to be so withheld under any provision of this Agreement, (i) the Buyer shall provide the Sellers' Representative with notice of any such required withholding at least two (2) business days before the date of such withholding and cooperate in any efforts to reduce or eliminate such withholding, (ii) such withheld amounts shall be remitted to the appropriate Governmental Authority in accordance with applicable Legal Requirements, and (iii) such withheld amounts shall be treated for all purposes of this Agreement as having been paid to the recipients in respect of which such deduction and withholding was made.

1.6    **Holdback**. To secure the indemnification, payment and performance obligations of the Sellers under this Agreement including pursuant to Section 1.5, ARTICLE V, and ARTICLE VII, the Buyer will withhold the Holdback Amount to be held and distributed by the Buyer on the terms and conditions of Section 7.9.

1.7    **Earn-Out Payment**.  If the requirements set forth on **Exhibit B** are met or exceeded, the Sellers are eligible to receive, in the aggregate, the Potential Payment in accordance with the terms of, and subject to the conditions set forth in, **Exhibit B**.  The aggregate amount payable to the Sellers pursuant to this Section 1.7 (the "**Earn-Out Amount**") shall be calculated and paid in accordance with **Exhibit B**.

## ARTICLE II
## REPRESENTATIONS AND WARRANTIES CONCERNING THE COMPANY

The Sellers represent and warrant to the Buyer that each of the statements contained in this ARTICLE II is true and correct.

2.1    **Organization, Power and Standing**.  Kappa Graphics is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware and has full limited liability company power and authority, and possesses all material Governmental Approvals, to own, lease and operate its properties and assets and to carry on its business as it is currently conducted.  KPFS is a

limited liability company duly formed, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has full limited liability company power and authority, and possesses all material Governmental Approvals, to own, lease and operate its properties and assets and to carry on its business as it is currently conducted.  The copies of the Organizational Documents of each of Kappa Graphics and KPFS that have been Made Available to the Buyer by the Company are true, correct and complete and the Company is not and has not been in violation, breach or default of any of the provisions thereof.

2.2     **Subsidiaries**.  The Company has no subsidiaries and does not, directly or indirectly, own or have the right or the obligation to acquire, and has not, directly or indirectly, owned or had the right or the obligation to acquire, any equity interest in any corporation, limited liability company, partnership, joint venture, trust or other Person.

2.3     **Foreign Qualifications**.  **Schedule 2.3** sets forth a true and complete list of all jurisdictions in which the Company is currently qualified to do business as a foreign entity.  The Company is duly licensed and qualified to do business and is in good standing in all such jurisdictions.  There are no other jurisdictions in which the Company must qualify to do business as a foreign entity, except for any jurisdiction(s) in which the failure to so qualify would not be material to the Company.

2.4     **Due Authorization**.  The Company has the power and authority and has duly taken all required action on its part necessary to permit it to, and it is authorized to, execute and deliver and to carry out the terms of each Transaction Document to which it is a party and consummate the Transaction.  The execution, delivery and performance by the Company of this Agreement and each Transaction Document to which it is or will be a party, and the consummation of the Transactions, have been duly authorized by all requisite limited liability company action on the part of the Company.

2.5     **No-Conflict; Required Consents and Approvals**.  Except as set forth in **Schedule 2.5**, none of the Company's execution, delivery and performance of this Agreement and the other Transaction Documents or the consummation of the Transactions will result in any violation of, be in conflict with or constitute a default under, result in the creation of any Liens (other than Permitted Liens) against the Sellers, the Company, the Purchased Securities, or the Business, or result in or give rise to any right of acceleration, amendment, cancellation, termination, or payment (whether or not with notice or lapse of time or both) of or under (a) the Organizational Documents of the Company, (b) any Material Contract, (c) any Permit or (d) any Legal Requirement.  Except as set forth on **Schedule 2.5**, no Permit, consent, order, approval, authorization, declaration or filing with or from any Governmental Authority or any party to a Material Contract is required on the part of the Company for or in connection with the execution and delivery of this Agreement or the consummation of the Transactions.

2.6     **Validity and Enforceability**.  This Agreement, and each of the other Transaction Documents to which the Company is or will be a party will be when executed and delivered by the Company, constitute valid and binding obligations of the Company enforceable against the Company in accordance with their respective terms, except as limited by (a) applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (b) laws related to the availability of specific performance, injunctive relief or other equitable remedies and (c) general principles of equity or public policy (collectively, clauses (a) through (c) the "**Remedies Exceptions**").

2.7     **Capitalization**.  **Schedule 2.7** sets forth a complete and accurate list of all issued and outstanding Equity Interests.  The Sellers are the sole owners, whether of record or beneficially, of all of the Purchased Securities, which constitute all of the issued and outstanding Equity Interests, and no other equity interests in the Company are authorized, outstanding, or otherwise in existence.  All outstanding

- 13 -

Equity Interests, including the Purchased Securities (a) are duly authorized, validly issued, and fully paid and non-assessable, (b) were issued in compliance with all applicable Legal Requirements, (c) were not subject to or issued in violation of any purchase option, call option, right of first refusal, preemptive right, subscription right, or any similar right under any applicable Legal Requirements, the Organizational Documents of the Company, or any Contract to which the Company is (or at the time of issuance, was) a party or otherwise bound. Except for the Buyer's rights pursuant to this Agreement, (i) there are no issued and outstanding (A) securities of the Company other than the Equity Interests, (B) warrants, options, preemptive rights, purchase rights, subscription rights, conversion rights, exchange rights, rights of first refusal, or other rights, Contracts or commitments (contingent or otherwise) with respect to any securities of the Company, or (C) stock appreciation, stock option plans, stock bonus plans, phantom stock, profit participation, or similar rights with respect to the Company, and there is no agreement or arrangement, whether or not yet fully performed, which would result in the creation of any of the foregoing, and (ii) neither any of the Sellers nor the Company is subject to or, by reason of any Contract in effect as of the date hereof, may become subject to, any obligation to issue, grant, sell, enter into, deliver, redeem, or otherwise transfer, acquire, or retire the Equity Interests or any other securities of the Company. The transactions contemplated by this Agreement, including the Transactions, are not subject to any preemptive rights. The Sellers have the right, power and authority to transfer all of the Purchased Securities to the Buyer, free and clear of any Liens other than restrictions on transfers under applicable securities laws.

        **2.8**    **Financial Statements; Accounts Receivable; Accounts Payable; Corporate Records**.

        **(a)**    The Company has Made Available to the Buyer true and complete copies of (collectively, the "**Financial Statements**"): (a) the audited income statements and balance sheets of each of Kappa Graphics and KPFS as at December 31, 2021 and December 31, 2022, (b) the unaudited income statements and balance sheets of each of Kappa Graphics and KPFS as at December 31, 2023, and (c) the unaudited income statement and balance sheet for the 1-month period ended January 31, 2024 for each of Kappa Graphics and KPFS. The Financial Statements (i) are true, complete and correct, (ii) have been prepared from and are consistent with the books and records of the Company in all material respects and (iii) fairly present, in all material respects and when considered on a combined basis, the financial position of Kappa Graphics and KPFS and results of their operations in each case, as of the dates or for the periods then ended in accordance with GAAP (except (x) as otherwise stated therein, (y) as set forth on **Schedule 2.8(a)** and (z) for the omission of footnotes and subject to normal and recurring year-end adjustments (none of which items under this clause (z) are or may reasonably be expected to be material individually or in the aggregate to the Business or the Company)).

        **(b)**    Set forth on **Schedule 2.8(b)** is a true and complete list of all accounts receivable of the Business as of January 31, 2024 (the "**Accounts Receivable**"), all of which are held by the Company. Each Account Receivable represents a sale made in the Ordinary Course for a bona fide sale of goods or services performed and subject to any bad debt reserve, constitute valid claims of the Company, and the Company has performed all of the obligations to produce and deliver the goods or perform the services to which such Account Receivable relates. No agreement for deduction, free goods, discount, or other deferred price or quantity adjustment has been made with respect to any Account Receivable. Neither the Sellers nor any of their respective Affiliates, including the Company, has collected, or accelerated the collection of, the Accounts Receivable in a manner that is inconsistent with the operation of the Business in the Ordinary Course.

        **(c)**    Set forth on **Schedule 2.8(c)** is a true and complete list of all accounts payable of the Business as of January 31, 2024 (the "**Accounts Payable**"), all of which are held by the Company. Each Account Payable (i) if applicable, is properly included in the Financial Statements in accordance with GAAP and is valued for purposes of the Financial Statements in accordance with GAAP; (ii) represents actual amounts incurred by the Company; and (iii) represents a payable incurred in the Ordinary Course,

and the Company has performed all of the obligations required to be performed by the Company in respect of such Account Payable on or prior to the date hereof.  No agreement for surcharge, loss of discount, or other increase of price or quantity has been made with respect to any Account Payable.  All Accounts Payable have been paid or are not yet due and payable as of the date of this Agreement.  Neither the Sellers nor any of their respective Affiliates, including the Company, has paid, or accelerated the payment of, any Account Payable in a manner that is inconsistent with the operation of the Business in the Ordinary Course.

(d)     Neither the Company, the Sellers nor any director, officer, employee, accountant or other agent of the Company has taken any action, or omitted to take any action, intended to artificially manipulate or modify the amount of the Company's working capital as of the Closing Date.  Since the date of the latest Financial Statements, all material operations of the Company, including but not limited to working capital, accounting policies, sales and marketing, human resources, and capital expenditures, have been managed in the Ordinary Course of Business and in a manner required to support the on-going operations of the Company. Except as set forth on **Schedule 2.8(d)**, all working capital and accounting policies are presented on the Financial Statements in accordance with the Accounting Principles.

(e)     The books of account and other financial records of the Company, all of which have been Made Available to the Buyer, are complete and correct in all material respects and reflect actual, bona fide transactions and have been maintained in accordance with sound business practices.  The minute books of the Company contain accurate and complete records of all material actions taken by the equity holders, the applicable governing body, and committees thereof.  None of the managers, officers, agents, or employees of the Company, the Sellers or any of their respective Affiliates acting with, on behalf of, or for the benefit of, the Company, has established, maintained or created any fund, asset or liability of the Company that has not been recorded in the books and records of the Company.

(f)     The Company has established and maintains proper and adequate internal accounting controls which provide assurance that (i) transactions are executed only in accordance with management's authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements of the Company in conformity with GAAP and to maintain accountability for the Company's assets; (iii) access to the Company's assets is permitted only in accordance with management's authorization; and (iv) accounts, notes and other receivables and inventory are recorded accurately, and proper and adequate procedures are implemented to affect the collection thereof on a current and timely basis.  Except as disclosed on **Schedule 2.8(f)**, since the Reference Date, there has been no, and there does not currently exist, any fraud, financial improprieties, or to the knowledge of the Company, allegation thereof, that involves management of the Company.

(g)     **Schedule 2.8(g)** sets forth, with respect to the Company, a correct and complete itemized list of (a) all Indebtedness of the Company, the Person to whom such amounts are owed, and the amounts outstanding with respect to such Indebtedness as of the date of this Agreement and (b) the Transaction Expenses and the Person to whom such amounts are owed.  Neither the Company nor any Seller has taken any action, or omitted to take any action, intended to artificially manipulate or modify the amount of the Company's Indebtedness or Transaction Expenses as of the Closing Date.

2.9     **No Material Adverse Change; Absence of Changes**.

(a)     From January 1, 2023 through the date of this Agreement, except as set forth on **Schedule 2.9(a)**, (i) the Company has conducted the Business in the Ordinary Course, and (ii) there has not been or occurred a Company Material Adverse Effect.

- 15 -

(b)     Since January 1, 2023, except as set forth on **Schedule 2.9(b)**, the Company has not taken or done any of the following actions, nor has any Seller or any of its Affiliates taken any of the following actions with respect to the Company:

(i)     amended or otherwise modified its Organizational Documents;

(ii)    redeemed, acquired, purchased, issued, granted any option, warrant, or other right to subscribe, sell, pledge, dispose of or encumber, or authorized the redemption, acquisition, purchase, issuance, grant of any option, warrant, or other right to subscribe, sale, pledge, disposition or encumbrance of, any securities of the Company, or effected a split, modification or reclassification of any securities of the Company;

(iii)   sold, assigned, pledged, leased, disposed of, transferred, or encumbered any of its assets, except for the sale of inventory in the Ordinary Course and the disposition of excess or obsolete equipment sold for a total in the aggregate of less than $50,000;

(iv)    declared, set aside or paid any distribution, or made any other distribution (whether actual, constructive, or deemed) with respect to, any securities of the Company, other than cash distributions by the Company to the Sellers that have been paid in full prior to the Closing;

(v)     created, incurred, assumed, or guaranteed, or agreed to create, incur, assume, or guarantee, any Indebtedness (other than the creation of accounts payable in the Ordinary Course) contingent or otherwise, by or on behalf of the Company;

(vi)    entered into, terminated, or materially amended any Material Contract except to the extent required by applicable Legal Requirements, or experienced any modification, suspension, revocation or termination of a Permit issued to the Company;

(vii)   acquired, or committed to acquire, any assets, whether through capital expenditures or otherwise, other than the purchase of raw materials and inventory in the Ordinary Course, for a purchase price in excess of $150,000;

(viii)  increased the cash compensation provided to any non-hourly Employee by more than three percent (3%), granted any equity compensation to any Employee or any former employee, consultant or independent contractor of the Company, or adopted, amended or terminated any Employee Plan;

(ix)    abandoned, assigned, permitted to lapse, cancelled, sold, transferred, or granted a license of any material Company Intellectual Property;

(x)     created, granted, or assumed any Lien with respect to the Equity Interests or any Lien with respect to the Property that will not be released prior to the Closing;

(xi)    taken any action to change any method of accounting or accounting policies of the Company (including, without limitation, procedures with respect to revenue recognition, payments of accounts payable, and collection of accounts receivable), other than as required by a change in GAAP;

(xii)   created any accounts payable or other trade obligations except in the Ordinary Course;

**(xiii)** revalued any of the Assets, including writing-off accounts receivable other than as required by GAAP;

**(xiv)** made any loan or advance to, assumed, guaranteed, or endorsed the obligations of any third party, indemnified any third party, issued any support guarantees, or otherwise became responsible for the obligations of any third party;

**(xv)** acquired or invested in, or agreed to acquire or invest in (by merger, exchange, consolidation, purchase, or otherwise), any corporation or partnership or interest in any business organization or entity;

**(xvi)** paid, discharged, or satisfied any claims, liabilities or obligations (absolute, accrued, asserted, or unasserted, contingent or otherwise), other than in the Ordinary Course;

**(xvii)** commenced any material Legal Proceeding(s);

**(xviii)** waived, released, assigned, settled or compromised any Legal Proceeding(s);

**(xix)** adopted or proposed a plan of complete or partial liquidation, dissolution, merger, consolidation, restructuring, recapitalization, or other reorganization;

**(xx)** entered into any new line of business;

**(xxi)** made or changed any Tax election of the Company; entered into any settlement or compromise with respect to any Taxes of the Company; amended any Tax Return relating to the Company; entered into any closing or similar agreement with respect to Taxes of the Company; or consented to any extension or waiver of the limitations period applicable to any Tax claim or assessment with respect to the Company; or changed (or made a request to any taxing authority to change) any method of accounting for Tax purposes or changed its Tax year; or made any voluntary Tax disclosure, Tax amnesty, or other similar filing; or

**(xxii)** authorized, committed or agreed to take any of the foregoing actions.

**2.10    Material Contracts**.

**(a)** <u>Schedule 2.10(a)</u> sets forth a list of all of the following Contracts to which the Company is a party or pursuant to which it is obligated:

**(i)** License, support or other Contracts with customers, excluding purchase orders and Contracts terminable by the Company on less than forty-five (45) days' notice without penalty;

**(ii)** Contracts relating to or evidencing any Indebtedness;

**(iii)** Contracts with any non-competition, exclusivity or "most favored nation" provision or other provision that purports to limit or restrict in any respect (A) the ability of the Company to solicit customers or employees or (B) the manner in which, or the location in which, all or any portion of the business of the Company is conducted;

- 17 -

(iv)    any Contract granting to another Person any power of attorney (whether revocable or irrevocable) or the authority to act for or on behalf of the Company;

(v)    Contracts with (i) a Seller or any Affiliate of the Company or (ii) any officer, manager, employee, or equity holder of the Company, a Seller or any of its Affiliates;

(vi)    any Contract for the employment or engagement of any person on a full-time, part-time, or consulting basis, or for the engagement of any independent contractor or consultant, whether employed or engaged directly by the Company or indirectly through a professional employer organization, staffing agency, employee leasing company or other similar arrangement;

(vii)    any Contract that is a profit-sharing, option, equity interest purchase, equity-based compensation, deferred compensation, or other plan or material arrangement, in each case, for the benefit of a current or former director, officer, manager, or Employee of the Company;

(viii)    any Contract providing for the disposition, merger or similar transaction of substantially all of the assets or business of the Company (other than sales of products in the Ordinary Course) or any agreement providing for the acquisition, merger, or similar transaction by the Company of substantially all of the assets or business of any other entity;

(ix)    any Contract that grants any right of first refusal, right of first offer, right of first negotiation, or similar right with respect to any material asset or business of the Company or that limits the ability of the Company to own or operate any material asset or business;

(x)    any Contract that requires the purchase of any product or service, or all or any portion of the Company's requirements, exclusively from a single party or grants exclusive rights to marketing or distribution;

(xi)    any material Contract or commitment not made in the Ordinary Course;

(xii)    supply, distribution or reseller Contracts involving payments in excess of $150,000 in the last twelve (12) completed months prior to the date of this Agreement;

(xiii)    any research and development Contracts;

(xiv)    any contracts with Governmental Authorities;

(xv)    any Contract that is a settlement, conciliation, or similar agreement;

(xvi)    any contract with a professional employer organization, staffing agency or employee leasing company pursuant to which employees of such organization, agency or company provide services to the Company; and

(xvii)    franchise, partnership joint venture and similar agreements.

(b)    All Contracts required to be listed on **Schedule 2.10(a)** and the IP Licenses are sometimes collectively referred to herein as the "**Material Contracts**."  The Company has Made Available to the Buyer true, correct and complete copies of all written Material Contracts and a written description of each Material Contract that is an oral agreement or arrangement, and none of such Material Contracts has

- 18 -

been modified or amended in any respect, except as reflected in such disclosure to the Buyer. Except as set forth on **Schedule 2.10(b)**, with respect to each Material Contract to which the Company is a party or by which the Company is otherwise obligated: (i) such Material Contract is in full force and effect with respect to the Company and, to the knowledge of the Company, each other party thereto; (ii) such Material Contract is enforceable against the Company and, to the knowledge of the Company, each other party thereto, except as enforceability may be limited by the Remedies Exceptions; (iii) neither the Company nor, to the knowledge of the Company, any other party thereto, is in breach or default in any material respect under such Material Contract, and no event has occurred which, after the giving of notice, with lapse of time, or both, would constitute such a breach or default in any material respect by the Company or, to the knowledge of the Company, any other party thereto, or would cause the acceleration of any obligation of the Company or any other party thereto or the creation of a Lien upon any assets of the Company, or would require any consent thereunder; (iv) there are no disputes, pending or to the knowledge of the Company, threatened, with regard to such Material Contract; and (v) the Company, and to the knowledge of the Company, each other party thereto, has performed all material obligations thereunder that are required to have been performed as of the date hereof.

(c)    Except as set forth on **Schedule 2.10(c)**, the Company has not received or provided any written notice, and, to the knowledge of the company, no Person has received or provided oral notice, of any intention to terminate, repudiate or disclaim any Material Contract.

2.11    **Real Property**.

(a)    The Company currently does not own, nor has ever owned, any real property.

(b)    **Schedule 2.11(b)** sets forth a correct and complete list of all real property leased, licensed, or otherwise used or occupied (but not owned) by the Company (collectively, the "**Leased Real Property**") under any lease, sublease, license, concession, or other Contract (each, a "**Real Property Lease**"). The Company has a valid and subsisting leasehold interest in its Leased Real Property, in each case free and clear of all Liens, other than Permitted Liens. All such Real Property Leases are in full force and effect, and there are no existing material breaches or defaults by, or any events that with or without the passage of time or the giving of notice, or both, would constitute a material breach, default or an event of default by, the Company under any Real Property Lease to which it is a party, or, to the knowledge of the Company, by any other party to any such Real Property Lease. No security deposit or portion thereof deposited with respect to any Real Property Lease has been applied in respect of a breach or default under such Real Property Lease that has not been redeposited in full. To the knowledge of the Company, with respect to each parcel of Leased Real Property, except as set forth on **Schedule 2.11(b)**, (i) the use, occupancy and operation of such parcel of Leased Real Property in the manner in which it is now used, occupied and operated substantially comply with all zoning, building, use, safety or other similar statutes, ordinances or regulations of any governmental entity, and such Leased Real Property has received all approvals of the required governmental entities (including permits) required in connection with the use, occupation and operation thereof for the purposes of the business of the Company, (ii) all improvements located on such parcel of Leased Real Property are in the aggregate in satisfactory operating condition and repair (ordinary wear and tear excepted) and the mechanical systems, HVAC systems, plumbing, electrical, security, utility and sprinkler systems are in reasonable, working condition, subject only to normal scheduled maintenance, are reasonably sufficient for the operation of such Leased Real Property for its current use, (iii) the Company has not received any written notice of any special tax, levy or assessment for benefits or betterments that affect such parcel of Leased Real Property; and (iv) the Company has not received written notice of any pending, or threatened in writing, condemnation, eminent domain, dedication or expropriation proceedings affecting such parcel of Leased Real Property or any part thereof. The Company has not received written notice of any pending or threatened in writing condemnation, eminent domain, dedication or expropriation proceedings affecting any Leased Real Property or any part thereof.

- 19 -

To the knowledge of the Company, there are no agreements granting any Person other than the Company that is party to each Real Property Lease the right to use or occupy any portion of the Leased Real Property. Correct and complete copies of the Real Property Leases have been Made Available to the Buyer prior to the date of this Agreement, and no changes have been made to any Real Property Leases since the date of delivery. Other than as Made Available to Buyer, there are no agreements with respect to any parcel of Leased Real Property that alter the terms of the applicable Real Property Lease.

2.12    **Title to Assets; Sufficiency; Personal Property**.

(a)    Except as set forth on **Schedule 2.12(a)**, the Company has good and marketable title to and is the sole and exclusive owner of all right title and interest in and to (i) all of the assets reflected as being owned by the Company on the Financial Statements and (ii) all other real, personal, and other tangible property owned by the Company or used by the Company, other than any property or assets leased to the Company (collectively, the "**Assets**" and, together with any tangible property or assets leased to the Company pursuant to the leases set forth on **Schedule 2.12(d)**, the "**Property**"). The Property constitutes all property and property rights, other than the Company Intellectual Property and the Leased Real Property, now used in or necessary for the conduct of the Business as currently conducted.

(b)    There exists no condition, restriction or reservation affecting the title to or utility or transfer of such Property which would prevent the Company or the Buyer from utilizing such Property after the Closing to the same full extent that the Sellers and/or the Company might continue to do so if the transactions contemplated hereby did not take place. Except as set forth on **Schedule 2.12(b)**, no tangible Property is in the possession of any Person other than the Company, and the Company does not hold any Property on consignment. Upon the Closing, the Company shall continue to be vested with good title to, or a valid leasehold interest or license right interest in, its Property.

(c)    Except as set forth on **Schedule 2.12(c)**, the tangible Property, whether owned or leased, has been maintained in accordance with normal industry practice and a sufficient amount of such tangible property is operational so as to permit the conduct of the Business in the Ordinary Course, given its age.

(d)    Set forth on **Schedule 2.12(d)** is a description of each lease pursuant to which the Company is the lessee of any tangible personal property and the location of such property. True and complete copies of all such leases have been Made Available to the Buyer. All rentals due under such leases have been paid and there exists no default by the Company or, to the knowledge of the Company, by any other party to such leases under the terms thereof in any material respect and no event has occurred which, upon passage of time or the giving of notice, or both, would result in any event of default by the Company or by any other party to such leases in any material respect, or prevent the Company from exercising and obtaining the benefits of any rights or options contained therein. The Company has all right, title, and interest of the lessee under the terms of each lease pursuant to which the Company is the lessee, free of all Liens other than Permitted Liens and all such leases are valid and in full force and effect.

2.13    **Intellectual Property**.

(a)    As used herein "**Intellectual Property**" means any of the following in any jurisdiction throughout the world: (a) issued patents and patent applications (whether provisional or non-provisional), including divisionals, continuations, continuations-in-part, substitutions, reissues, reexaminations, extensions, or restorations of any of the foregoing, and other Governmental Authority-issued indicia of invention ownership (including certificates of invention, petty patents, and patent utility models) ("**Patents**"); (b) trademarks, service marks, brands, certification marks, logos, trade dress, trade names, and other similar indicia of source or origin, together with the goodwill connected with the use of

and symbolized by, and all registrations, applications for registration, and renewals of, any of the foregoing ("**Trademarks**"); (c) copyrights and works of authorship, and all registrations, applications for registration, and renewals of any of the foregoing ("**Copyrights**"); (d) internet domain names, whether or not Trademarks, all associated web addresses, URLs, websites and web pages, and all content and data thereon or relating thereto, whether or not Copyrights; (e) industrial designs, and registrations, applications for registration, and renewals thereof; (f) trade secrets, know-how, inventions (whether or not patentable), discoveries, improvements, technology, business and technical information, databases, data compilations and collections, tools, methods, processes, techniques, and other confidential and proprietary information and all rights therein ("**Trade Secrets**"); (g) Software; and (h) all other intellectual property rights of any kind and nature.  As used herein, "**Company Intellectual Property**" means Intellectual Property owned or purported to be owned by the Company or used or held for use in the Ordinary Course.

> **(b)**    **Schedule 2.13(b)** hereto contains a correct and complete list of all: (i) Company Intellectual Property that the Company owns and has registered with (or issued by) a Governmental Authority or registrar, or with respect to which the Company has filed an application for such a registration that is pending; (ii) material unregistered Trademarks owned by the Company included in the Company Intellectual Property; and (iii) Company Software, other than "off-the-shelf" Software or Software licensed to the Company under "shrink wrap," "click through", terms of service, or terms of use.  The Company has made all necessary filings and paid all necessary registration, maintenance and renewal fees for the purpose of maintaining the Company Intellectual Property described in (i) above.

> **(c)**    **Schedule 2.13(c)** contains a list of (i) all licenses granted by the Company or the Sellers to any third party with respect to any owned Company Intellectual Property; and (ii) all licenses of Intellectual Property granted by the Sellers, an Affiliate or any third party to the Company with respect to any Intellectual Property, excluding "off-the-shelf," Software or Software licensed to the Company under "shrink wrap," "click through", terms of service, or terms of use (collectively, the "**IP Licenses**").

> **(d)**    Except as set forth in **Schedule 2.13(d)**, Company is the sole and exclusive legal and beneficial owner of all right, title and interest in and to the Company Intellectual Property, or otherwise has the valid right to use same, in each case, free and clear of Liens other than Permitted Liens.  The Company Intellectual Property constitutes all of the Intellectual Property necessary to operate the Business as currently conducted.

> **(e)**    All of the Company Intellectual Property owned by the Company is valid and enforceable, and all registered Intellectual Property included in the Company Intellectual Property owned by the Company is subsisting and in full force and effect.  The Company has taken all reasonable steps, in accordance with good business practices, to maintain, protect and enforce the Company Intellectual Property owned by the Company.

> **(f)**    To the knowledge of the Company, the Company, the conduct of the Business, including the use of Company Intellectual Property and the products, processes, and services of the Business have not infringed, misappropriated, or otherwise violated the Intellectual Property or other rights of any Person and are not currently violating, infringing or misappropriating the Intellectual Property of any other Person, and to the knowledge of the Company, no third party is violating, infringing or misappropriating in any Company Intellectual Property owned by the Company.  The Company has not received any written or, to the knowledge of the Company, oral notice from any Person claiming any violation, infringement or misappropriation by the Company of another Person's Intellectual Property rights (including any demands or unsolicited "offers" to license Intellectual Property from another Person), or regarding the use or ownership of any Company Intellectual Property owned by the Company, or challenging or questioning the validity or enforceability of any Company Intellectual Property owned by the Company.

- 21 -

      **(g)**    The Company has taken commercially reasonable steps to prevent the unauthorized disclosure or use of its Trade Secrets and confidential information.

      **(h)**    The owned Company Software does not, and to the knowledge of the Company, the licensed Company Software does not, contain any Malicious Code (i) that materially disrupts, disables, harms or adversely affects the functionality of the Company Software; (ii) that is intended to damage or destroy any data or file or send information to any third party without the Company's consent; or (iii) that enables or assists any Person to access without authorization any Company Software.  None of the owned Company Software, or to the knowledge of the Company, the licensed Company Software, (x) constitutes or contains spyware or trackware, (y) records a user's actions without such user's knowledge or consent or (z) employs a user's Internet connection without such user's knowledge or consent to gather or transmit information on such user or such user's behavior.  To the knowledge of the Company, there has not been any material malfunction, failure or security breach with respect to the Company Software.

      **(i)**    The Company Software together with the licensed Software listed in **Schedule 2.13(c)(ii)** includes all material Software necessary for the operation of the Business as currently conducted. The Company does not own any Company Software. The Company has at times obtained and maintained all licenses (in sufficient quantities and under sufficient terms) necessary or required for the Company and the Business to make valid and non-infringing use of all Software owned by another Person used or held for use by the Company or the Business.  The Company has at all times since the Reference Date complied with all such licenses and any other Contracts relating to Company Software in all material respects.  The Company has the right to use and exploit, and after Closing, the Company will continue to have the right to use and exploit, each item of the Company Software in the same manner and to the same extent as it was used and exploited by and on behalf of Company immediately prior to the Closing.

      **(j)**    All Persons who contributed to the development of any Company Intellectual Property owned by the Company (including the Company Software) did so either (i) within the scope of his or her employment or engagement such that, subject to and in accordance with applicable law, all such Intellectual Property arising therefrom is the exclusive property of the Company; or (ii) pursuant to written agreements assigning to the Company all such Intellectual Property arising from his or her employment or engagement with the Company.  To the knowledge of the Company, no such Person is in breach of any such written agreement or no such Person has any claim, right or interest in or to any Company Intellectual Property.

      **(l)**    All Company IT Systems operate in all material respects in accordance with their documentation and specifications and are sufficient to support the operation of the Business as currently conducted.  All Company IT Systems have been maintained in accordance with reasonable industry standards.  There are no material problems or defects in any Company IT Systems that prevent or would prevent such Company IT Systems from operating substantially in accordance with reasonable industry standards.  The Company IT Systems have not experienced any material malfunction or failure since the Reference Date. The Sellers and the Company have provided the Buyer full access to documentation of any material defects, bugs, or deficiencies for Company IT Systems.  The Company IT Systems include commercially reasonable data storage, system redundancy, and disaster avoidance and recovery systems, including systems for the regular back-up and prompt recovery of the data and information necessary to the conduct of the Business without any disruption to, or interruption in, the conduct of Business.  To the knowledge of the Company, no Company IT Systems contain any Malicious Code.

    **2.14**    **Data Privacy and Security.**

      **(a)**    The Company has in place policies and practices regarding Company Data and the privacy, security, and Processing thereof ("**Company Data Policies**") that comply, in all material respects,

with all Information Requirements.  The Company is, and has been since the Reference Date, in compliance in all material respects with all Company Data Policies.  Without limiting the foregoing, the Company has established and has maintained and complied with, since the Reference Date, an information security program (or programs) covering the Company Data and all Company IT Systems that: (i) includes not less than reasonable and appropriate technical, administrative, and physical safeguards; (ii) assures the reasonable availability, integrity, security, and confidentiality of the Company Data and all Company IT Systems; and (iii) protects against the occurrence of any Security Incident.

(b)     The Company has obtained and maintained all consents, permissions, authorizations and other rights required by all Information Requirements with respect to all Company Data and the Processing thereof.  Except as set forth on **Schedule 2.14(b)**, the Company does not collect, maintain, or Process any Personal Information.

(c)     The Company has at all times since the Reference Date complied with all Information Requirements.  The Sellers and the Company have not received since the Reference Date any written notice alleging the occurrence of any failure to comply with any Information Requirements.  The Sellers and the Company have not received since the Reference Date written notice alleging the occurrence of any failure by the Sellers or the Company to comply with any Information Requirements.  The Company is not prohibited by any Information Requirement from consummating the execution, delivery, or performance of this Agreement.  Neither the execution, delivery, or performance of this Agreement, nor any subsequent transfer of any Company Data in connection with this Agreement, will cause, constitute, or result in a breach or violation of any applicable Information Requirements.  There is no, and there has at no time been since the Reference Date, any complaint or any investigation, action or other Legal Proceeding pending, or to the knowledge of the Company, threatened, against the Company by any Person with respect to any breach or violation of any Information Requirements or any Company Data or the Processing thereof.

(d)     Since the Reference Date, there has been no Security Incident, and the Company has not received written, or to the knowledge of the Company, oral, notice alleging the occurrence of a Security Incident.  The Company has not notified, and there have been no facts or circumstances that would require the Seller or the Company to notify, any other Person of any actual or perceived Security Incident or any violation of any Information Requirements.

(e)     The Company has not Processed Company Data outside of the United States.  The Company is not subject to or required to comply with the EU General Data Protection Regulation, the UK Data Protection Act 2018, or any other privacy or security Legal Requirements of the EU (or any EU member state) or the UK.

2.15     **Regulatory and Legal Compliance**.  Except as set forth on **Schedule 2.15**, since the Reference Date, each of the Sellers, with respect to the Business, and the Company (a) has been in compliance in all material respects with all applicable Legal Requirements and (b) has not received any written, or to the knowledge of the Company, oral, notice from any Governmental Authority of any actual or alleged violation of any Legal Requirement.

2.16     **Licenses and Permits**.  Each of the Sellers, with respect to the Business, and the Company holds, and at all times since the Reference Date has held, all material Permits necessary for the operation of the Business or to own, lease, operate or use the assets of the Company, and each such Permit currently required to be held by the Sellers, with respect to the Business, or by the Company is valid, subsisting and full force and effect and listed on **Schedule 2.16(a)**.  Each of the Sellers, with respect to the Business, and the Company is and has since the Reference Date been in compliance in all material respects with such Permits required to be held by it and has not received any written, or to the knowledge of the Company, oral, notice asserting any violation, default or failure to comply with any such Permit.  Since the Reference

Date, neither the Sellers, with respect to the Business, nor the Company has been informed in writing or, to the knowledge of the Company, orally, that such Permits will be cancelled, suspended, revoked, invalidated or will not be renewable upon expiration.  Except as set forth on **Schedule 2.16(b)**, each such Permit will remain valid, subsisting and in full force and effect through the Transactions without consent, waiver, approval or authorization of, filing or registration with, or notice to, any Governmental Authority or third party.

      **2.17**    **Taxes**.

      **(a)**    All Tax Returns required to be filed by, on behalf of, or with respect to the Company have been duly filed on a timely basis (taking into account any applicable extension of time within which to file); such Tax Returns are true, correct and complete in all material respects; and all material Taxes due by or with respect to the Company, whether or not stated as due on any such Tax Return, have been timely and fully paid.

      **(b)**    True, correct and complete copies of all Income Tax Returns and other Tax Returns filed by or with respect to the Company for each of the last four taxable periods have been Made Available to the Buyer.  True, correct and complete copies of all Tax examination reports and statements of deficiencies assessed against, or agreed to, with respect to the Company since December 31, 2018, have been Made Available to the Buyer.

      **(c)**    Except as set forth on **Schedule 2.17(c)**, the Company (A) has not been, and is not currently being, audited or subject to any other proceeding by any Governmental Authority with respect to Taxes, (B) has not received written notice of initiation of any Tax audit or other Tax proceeding by any Governmental Authority for which the statute of limitations for assessment of Taxes remains open, (C) has fully paid or otherwise settled all deficiencies for Taxes asserted or assessed against the Company by a Governmental Authority, (D) is not currently the beneficiary of any extension of time within which to file any Tax Return (other than automatic extensions), (E) has no outstanding agreements, waivers or arrangements entered into by or on its behalf, extending the statutory period of limitations applicable to any claim for, or the period for the collection or assessment of, any Taxes, and (F) is not a party to any Tax allocation, indemnity or similar sharing agreement with respect to Taxes (excluding commercial agreements entered into in the Ordinary Course, the primary purpose of which is unrelated to Taxes).

      **(d)**    Except as set forth on **Schedule 2.17(d)**, (A) all material Taxes that the Company is or was required to withhold or to collect for payment have been duly withheld and collected and have been timely paid to the proper Governmental Authority, and (B) the Company has complied in all material respects with all Tax information reporting provisions of all applicable Legal Requirements, including properly completing and filing all IRS Forms W-2 and 1099 with respect thereto.

      **(e)**    The Company has not received written notice from a Governmental Authority in a jurisdiction where the Company does not file a Tax Return that the Company is or may be subject to taxation in that jurisdiction.

      **(f)**    The Company has either (i) filed or caused to be filed with the appropriate Governmental Authority all unclaimed property reports required to be filed and remitted to the appropriate Governmental Authority all unclaimed property required to be remitted, or (ii) delivered or paid all unclaimed property to its original or proper recipient.

      **(g)**    The Company has not engaged in a transaction that is the same as or substantially similar to one of the types of transactions that the IRS has identified by notice, regulation, or other form of published guidance as a reportable transaction, as set forth in Section 6707A(c)(1) of the Code and Treasury

regulations Section 1.6011-4(b). No Tax Return filed by the Company contained or was required to contain a disclosure statement under Sections 6011 or 6662 of the Code (or any predecessor statute) or any similar provision of state, local, or foreign law.

      **(h)** The Company has no liability for unpaid Taxes of any other Person, including as a former member of a consolidated, combined or unitary group, as a transferee or successor, by contract, or otherwise.

      **(i)** There are no Liens for Taxes upon the assets of the Company, except for Permitted Liens.

      **(j)** The Company is not a party to any joint venture, partnership or other arrangement or Contract that could be treated as a partnership or other fiscally transparent entity for Income Tax purposes.

      **(k)** Neither the Buyer nor the Company will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date as a result of any: (i) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign Income Tax Legal Requirement) executed by the Company on or prior to the Closing Date; (ii) installment sale or open transaction disposition made by the Company on or prior to the Closing Date; (iii) change in accounting method; or (iv) use of an improper method of accounting in a taxable period ending on or prior to the Closing Date.

      **(l)** The Company does not have any outstanding or pending rulings of, or requests for rulings by, any Governmental Authority with respect to Taxes that are, or if issued would be, binding on the Company for any Tax period (or portion thereof) beginning after the Closing Date.

      **(m)** The Company has properly collected and remitted sales and similar Taxes with respect to sales or leases made or services provided to its customers and has properly received and retained any appropriate Tax exemption certificates or other documentation for all such sales, leases, or other services made without charging or remitting sales or similar Taxes that qualify as exempt from sales and similar Taxes.

      **(n)** In the past five (5) years, the Company has not constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock intended to qualify for tax-free treatment under Section 355 of the Code.

      **(o)** No Asset of the Company is (i) property required to be treated as owned by another Person pursuant to the provisions of Section 168(f)(8) of the Code, as amended and in effect immediately prior to the enactment of the Code, (ii) "tax-exempt use property" within the meaning of Section 168(h)(1) of the Code, (iii) "tax-exempt bond financed property" within the meaning of Section 168(g)(5) of the Code, (iv) "limited use property" within the meaning of Revenue Procedure 2001-28, 2001-1 C.B. 1156, (v) subject to Section 168(g)(1)(A) of the Code or (vi) subject to a "Section 467 rental agreement" as defined in Section 467 of the Code.

      **(p)** The Company has not granted any power of attorney with respect to any matters related to Taxes that is currently in force.

      **(q)** The Company has not claimed any employee retention tax credits under the CARES Act.

(r)     The Company does not own, and has never owned, any shares of a "controlled foreign corporation" (as defined in Section 957 of the Code) or a "passive foreign investment company" (as defined in Section 1297 of the Code).

(s)     Each Seller is a "United States person" as such term is used in Section 1445 of the Code. The Company has not been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code. The Company has never (i) had a permanent establishment in any country other than the country under the Legal Requirements of which it is organized, as defined in any applicable treaty or convention between such country and the jurisdiction of the entity's incorporation or formation or (ii) engaged in activities in any country other than the country under the Legal Requirements of which it is organized that would subject it to Tax by such jurisdiction.

(t)     No representation or warranty is made in this <u>Section 2.17</u> with respect to any Taxes that may accrue in any taxable period (or any portion of a taxable period) that begins on or after the Closing Date.

**2.18    Litigation**.  Except as disclosed on **<u>Schedule 2.18</u>**, there is currently no, and since the Reference Date there has not been any (a) Legal Proceeding pending or, to the knowledge of the Company, threatened  against the Company or the Sellers with respect to the Business, (b) audit, examination or investigation by any Governmental Authority pending or, to the knowledge of the Company, threatened against the Company or the Sellers with respect to the Business, (c) Legal Proceeding pending or, to the knowledge of the Company, threatened  by the Company or the Sellers with respect to the Business against any third party or (d) outstanding order, injunction, judgment, decree or ruling of any Governmental Authority imposed or, to the knowledge of the Company, threatened  to be imposed upon the Company or the Sellers with respect to the Business.

**2.19    Labor and Employees; Benefits.**

(a)     **<u>Schedule 2.19(a)</u>** accurately sets forth for each Employee: (i) name and job title; (ii) principal work location; (iii) date of hire or engagement; (iv) classification as employee or contractor; (v) whether classified as exempt under the Fair Labor Standards Act or analogous state law; (vi) current compensation rate; (vii) number of hours of vacation time or paid time off currently accrued and the dollar amount thereof; and (viii) whether on leave or layoff status and expected date of return.

(b)     Except as set forth on **<u>Schedule 2.19(b)</u>**, since the Reference Date, the Company has been in compliance in all material respects with all applicable Legal Requirements concerning employment and employment practices, including without limitation laws regarding wages, hours, improper deductions from earned wages, minimum wages, maximum hours of work, wage statements, frequency or method of wage payments, payroll-tax withholdings, work performed on Sundays, meal breaks or any other rest period, vacation, sick time, employment documentation and other personnel-related recordkeeping, equal employment opportunities, fair employment practices, plant closings and mass layoffs, sexual harassment, discrimination, retaliation, whistleblowing, unemployment insurance, privacy, workers' compensation, family and medical leave, and occupational safety and health requirements.  Since the Reference Date, (i) each Person performing work for the Company under a non-employee classification, including but not limited to independent contractors, consultants, interns or otherwise, has satisfied the requirements of applicable Legal Requirements to be so classified at all times when such non-employee classification has been in place, and (ii) each employee performing work for the Company has been classified properly as exempt or non-exempt under applicable Legal Requirements relating to regular wages and overtime compensation.  The Company has not received written notice from any Governmental Authority that the Company has violated any Legal Requirement involving any of the above employment

- 26 -

practices, including hiring, firing, eligibility to work in any jurisdiction, wages, hours, collective bargaining, unfair labor practices, employment discrimination, employee classification, workers' compensation, family and medical leave, occupational safety and health requirements, disability, employee benefits, harassment and civil rights.

(c)     Except as set forth on **Schedule 2.19(c)**, no third party has claimed in writing, or to the knowledge of the Company, orally,  that any Employee or any other Person currently or formerly employed or engaged by the Company since the Reference Date (i) has violated any of the terms or conditions of his, her or its employment, non-competition, non-solicitation or non-disclosure agreement with such third party, (ii) has disclosed or utilized any Trade Secret or proprietary information or documentation of such third party, or (iii) has interfered in the employment relationship between such third party and any of its present or former employees.  The Company has no obligation to indemnify any Person for violation of any Legal Requirement or for the violation of any restrictive covenant.

(d)     The Company is not a party to or bound by any Contract with an Employee that cannot be terminated by the Company at will, without prior notice and without payment of severance or other penalty, except pursuant to the terms of any collective bargaining agreement disclosed on **Schedule 2.19(e)**.  The Company has Made Available to the Buyer accurate and complete copies of all employee manuals, employee handbooks, and personnel policies of the Company or otherwise applicable to Employees.

(e)     Except as disclosed on **Schedule 2.19(e)**, the Company is not now, and has not been since the Reference Date, party to or bound by any collective bargaining agreement or other Contract, or any duty to bargain, with a labor union, works counsel or other labor organization, or party to any representation proceeding before the National Labor Relations Board.  The Company is not aware of any pending or threatened labor organizing activity other than organizing activity relating to the collective bargaining agreements disclosed on **Schedule 2.19(e)**. There is not now, and has not been in the past three (3) years, any strike, slowdown, work stoppage, lockout or picketing involving the Company or any Employees. There are no pending grievances or arbitrations arising under or relating to any of the collective bargaining agreements required to be disclosed on **Schedule 2.19(e)**.

(f)     **Schedule 2.19(f)** sets forth a true, correct and complete list of all Employee Plans and each Multiemployer Plan to which the Company or an ERISA Affiliate has an obligation to contribute.  To the extent applicable with respect to each Employee Plan, true, correct and complete copies of the most recent documents described below have been Made Available to the Buyer: (i) all plan documents and amendments thereto (or, in the case of unwritten plans, a written description thereof) and any written policies and/or procedures used in plan administration; (ii) current summary plan descriptions and any summaries of material modifications; (iii) IRS determination letter and any outstanding request for a determination letter; (iv) Form 5500 for the two (2) most recent plan years, including without limitation all schedules thereto, all financial statements with attached opinions of independent accountants, and all actuarial reports; (v) in the case of an Employee Plan that is a "group health plan" as defined in Code Section 5000(b)(1), general notification to employees of their rights under Code Section 4980B, form of letters distributed upon the occurrence of a qualifying event described in Code Section 4980B, HIPAA policies and procedures and HIPAA notice of privacy practices; (vi) administrative service agreements, HIPAA business associate agreements, related trust agreements, annuity contracts and other funding instruments; and (vii) all material written correspondence with any Governmental Authority. The Company does not sponsor any Employee Plan which is a qualified retirement plan under Code Section 401(a), and the 401(k) Plan for Kappa Group Employees in which employees of the Company are eligible to participate is sponsored by Spartan Organization, Inc.

**(g)**       Each Employee Plan and related trust agreement, annuity contract or other funding instrument has been established, administered, operated, and maintained in material compliance with its terms, ERISA, the Code and any other applicable laws.  The Company has no direct or indirect material liability under the requirements provided by any and all statutes, orders or governmental rules or regulations, including but not limited to ERISA, COBRA, HIPAA and the Code. With respect to each Employee Plan, no prohibited transactions (as defined in ERISA Section 406 or Code Section 4975) for which an applicable statutory or administrative exemption does not exist have occurred and no breaches of any of the duties imposed on Employee Plan fiduciaries by ERISA with respect to the Employee Plans have occurred that could reasonably be expected to result in any material liability or excise Tax under ERISA or the Code being imposed on the Company.  Each Employee Plan may be amended or terminated by the Company or the Buyer on or at any time after the Closing Date without liability to the Company or the Buyer.  None of the rights of the Company under an Employee Plan will be impaired by the consummation of the transactions contemplated by this Agreement.

**(h)**       Each Employee Plan that is intended to be qualified under Section 401(a) of the Code is so qualified and has received a favorable determination letter from the IRS, or with respect to a prototype or volume submitter plan, can rely on an opinion or advisory letter from the IRS to the prototype or volume submitter plan sponsor, to the effect that such plan is so qualified and that the plan and the trust related thereto are exempt from federal income Taxes under Sections 401(a) and 501(a), respectively, of the Code.  With respect to each Employee Plan intended to be qualified under Section 401(a) of the Code, (i) **Schedule 2.19(h)** sets forth a complete list of each outstanding loan owed by a participant in such Employee Plan in respect of his or her account thereunder, (ii) no capital stock or other equity interests of the Company is held as an asset in any such Employee Plan and (iii) the Company has not committed to make with respect to the current plan year, or has with respect to the immediately preceding plan year made, a matching or voluntary employer contribution under the terms of such Employee Plan.

**(i)**       There is no pending or, to the knowledge of the Company, threatened Legal Proceeding against or involving any Employee Plan, other than routine claims for benefits and domestic relations order proceedings.  No Employee Plan is, or was during the last two (2) years, the subject of an audit or other inquiry from the IRS, U.S. Department of Labor, PBGC or other Governmental Authority, nor is any Employee Plan the subject of an active filing under any voluntary compliance, amnesty, closing agreement or other similar program sponsored by any Governmental Authority, and no completed audit, compliance filing or closing agreement has resulted in the imposition of any material Tax, interest or penalty that has not been satisfied.  Neither the Company nor any of its directors, officers, employees or any plan fiduciary has any liability for failure to comply with ERISA, HIPAA, COBRA or the Code for any action or failure to act in connection with the administration or investment of any Employee Plan.

**(j)**       Except as set forth on **Schedule 2.19(j)**, all contributions to the Employee Plans have been made on a timely basis in accordance with ERISA and the Code. All insurance premiums (including premiums to the PBGC) have been paid in full, subject only to normal retrospective adjustments in the Ordinary Course, with regard to the Employee Plans for policy years or other applicable policy periods ending on or before the Closing Date.

**(k)**       Except as otherwise disclosed on **Schedule 2.19(k)**, neither the Company nor any ERISA Affiliate has ever maintained, contributed to, participated in, sponsored or otherwise had any liability with respect to (i) a Multiemployer Plan, (ii) an employee benefit plan subject to Title IV or Section 302 of ERISA or Sections 412 or 4971 of the Code, (iii) a "multiple employer plan" within the meaning of Sections 201, 4063 or 4064 of ERISA or Section 413(c) of the Code, (iv) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA, (v) a voluntary employees' beneficiary association within the meaning of Section 501(c)(9) of the Code or (vi) a self-funded or self-insured health plan. Except as set forth on **Schedule 2.19(k)**, (A) all contributions required to be paid by the Company or

its ERISA Affiliates have been timely paid to any Multiemployer Plan which is required to be disclosed on **Schedule 2.19(f)**; (B) neither the Company nor any ERISA Affiliate has incurred any withdrawal liability under Title IV of ERISA which remains unsatisfied; (C) pursuant to Section 4218 of ERISA, the Closing should not trigger any withdrawal liability under any Multiemployer Plan; and (D) the Company has not received written notice that such Multiemployer Plan is in critical, endangered or seriously endangered status or has suffered a mass withdrawal.

(l)    No Employee Plan provides life, health or other welfare benefits to former or retired employees of the Company or any ERISA Affiliate, and neither the Company nor any of its ERISA Affiliates has any liability or obligation to provide life, medical or other welfare benefits to former or retired employees, other than pursuant to COBRA or similar state laws which require limited continuation of coverage for such benefits. No Employee Plan provides benefits to any individual who is not a current or former employee of the Company, or a dependent or beneficiary of any such current or former employee. Each individual who is classified by the Company as an independent contractor has been properly classified for purposes of participation and benefit accrual under each Employee Plan.

(m)    Each Employee Plan which is a "nonqualified deferred compensation" plan within the meaning of Section 409A of the Code has been operated and administered in compliance with Section 409A of the Code, and has been in material documentary compliance with Section 409A of the Code. Neither the Company nor any of its ERISA Affiliates has any (i) liability for withholding taxes or penalties due under Code Section 409A or (ii) obligation to indemnify or gross-up for any Taxes imposed under Code Sections 409A or 4999.

(n)    The Company, its ERISA Affiliates and each Employee Plan are in compliance with the ACA, including compliance with all filing and reporting requirements, all waiting periods and the offering of affordable health insurance coverage compliant with the ACA to all employees and contractors who meet the definition of a full-time employee under the ACA. The Company and its ERISA Affiliates are not otherwise liable or responsible for any assessable payment, taxes, or other penalties under Section 4980H of the Code or otherwise under the ACA or in connection with requirements relating thereto.

(o)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement could (either alone or together with any other event or events, including termination of service) (i) entitle any current or former director, officer, Employee or other service provider of the Company to any benefit or compensation; (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation or benefits due, to any such current or former director, officer, Employee or other service provider of the Company; (iii) require any contributions or payments to fund any obligation under any Employee Plan; or (iv) give rise to the payment of any amount that would not be deductible pursuant to Section 280G of the Code.

(p)    The Company has at all times since the Reference Date complied in all material respects with the requirements of all applicable Legal Requirements regarding immigration, including but not limited to the requirements under the federal Immigration Reform and Control Act of 1986. The Company has on file a complete and current I-9 form for all current and former employees to the extent required by federal law.

(q)    The Company has not, in the past three (3) years, experienced a "mass layoff" or "plant closing" as defined in the federal Worker Adjustment and Retraining Notification Act or similar event under analogous state or local law.

(r)    To the knowledge of the Company, no non-hourly Employee: (i) intends to terminate his/her employment or engagement with the Company, (ii) has received an offer to join a business

- 29 -

that may be competitive with the business of the Company, or (iii) is bound by any confidentiality agreement, noncompetition agreement or other Contract (with any Person) that may reasonably be expected to have an adverse effect on the performance by such Employee of his or her duties or responsibilities as an Employee of the Company.

**2.20    Environmental Laws**.

(a)    For purposes of this Agreement, the following definitions shall apply:

(i)    "**Environment**" shall mean soil, surface waters, groundwaters, land, natural resources, surface or subsurface strata and ambient air (including indoor air).

(ii)    "**Environmental Laws**" shall mean all applicable foreign, federal, provincial, state and local statutes, regulations, rules and ordinances relating to human health or safety, Environment, natural resources, pollution, Hazardous Substances or the manufacture, processing, distribution, use, treatment, storage, release, transport, handling, disposal or discharge of materials (including Hazardous Substances) into the Environment, including common law theories such as negligence, nuisance, and trespass.

(iii)    "**Hazardous Substances**" shall mean any hazardous, toxic or radioactive chemical, material, substance, pollutant, or waste regulated by any Environmental Law, including any "hazardous substance," "hazardous material," "hazardous chemical," "hazardous waste," "toxic substance," "toxic waste," "pollutant," "contaminant" or words of similar import under any Environmental Law, including asbestos, petroleum and petroleum products.

(b)    Except as disclosed on **Schedule 2.20(b)**, since the Reference Date, the operations of the Business and the Company have complied in all material respects with all applicable Environmental Laws.

(c)    There is no pending or to the knowledge of the Company, threatened investigation by any Governmental Authority or any other Person, nor any pending, or to the knowledge of the Company, threatened action or proceeding by any Governmental Authority or any other Person with respect to the Company or the Business, relating to Hazardous Substances or liability under Environmental Law.

(d)    Except as set forth on **Schedule 2.20(d)**, the Company possesses all Governmental Approvals required by applicable Environmental Laws, and no deficiencies have been asserted by any Governmental Authority.  The Company is, and since the Reference Date has been, in compliance in all material respects with all terms and conditions of such Governmental Approvals.

(e)    Except as disclosed on **Schedule 2.20(e)**, since the Reference Date, neither the Company nor the Sellers with respect to the Business has received any written, or to the knowledge of the Company, oral,  notice regarding any information request from any Governmental Authority, actual or alleged violation by the Company or the Business of Environmental Laws, any potential liability under any Environmental Law, or any investigatory, remedial or corrective obligations of the Company or the Business under Environmental Laws.

(f)    The Company has not agreed to indemnify any Person, including a predecessor, buyer, seller, landlord, or tenant, with respect to any liabilities or threatened liabilities pursuant to any Environmental Law, nor has the Company assumed such liabilities of any third person.

- 30 -

**(g)** Since the Reference Date, no Hazardous Substance has been discharged, disposed of, dumped, injected, pumped, deposited, spilled, leaked, emitted, disposed or released at, on, under, to or from any location, property or facility at any time owned, leased, or operated by the Company or Business in violation of Environmental Laws. No remedial or removal action or investigation of Hazardous Substances is occurring at any property (i) currently owned, leased or operated by the Company or Business, or (ii) to the knowledge of the Company, formerly owned, leased or operated by the Company or Business.

**(h)** Since the Reference Date, neither the Business nor the Company has generated, handled, treated, recycled, stored, transported, disposed of, arranged for the disposal of, or released any Hazardous Substance that could reasonably be expected to give rise to material liabilities to the Business or the Company under Environmental Laws.

**(i)** Except as set forth on **Schedule 2.20(i)**, to the knowledge of the Company, none of the following exists at any property currently owned, leased, or operated by the Company: underground storage tanks, asbestos containing materials, groundwater monitoring wells, drinking water wells, production water wells, polychlorinated biphenyls, dumps, landfills or waste disposal areas.

**2.21** **Insurance**. The Company is, as of the date of this Agreement, insured under the insurance policies listed on **Schedule 2.21(a)** (the "**Insurance Policies**") which Schedule also sets forth the name of the insurer, policy number, type of insurance, coverage and the annual premiums paid in respect of each such policy. Except as disclosed on **Schedule 2.21(b)**, there are no claims pending under any such Insurance Policy relating to the Business or the Company as to which the respective insurers have denied or disputed coverage. The Insurance Policies are in full force and effect and the Company is not in default in any material respect under the terms of the Insurance Policies. All premiums due to date under such policies have been paid. No written notice of cancellation or termination has been received by the Company with respect to any of the Insurance Policies. Except as disclosed on **Schedule 2.21(b)**, there are no claims pending or, to the knowledge of the Company, threatened under any of the Insurance Policies relating to the Business or the Company, no such claim has been made relating to the Business or the Company under any of the Insurance Policies since the Reference Date, and, to the knowledge of the Company, has timely provided notice of such claims to their insurers and the insurers have not issued any written reservation of rights with respect to such claims. The Insurance Policies are sufficient for compliance with all Legal Requirements.

**2.22** **Affiliate Transactions**. Except for the Company's Organizational Documents, and as disclosed on **Schedule 2.22**, (a) the Company is not a party to any Contract with the Sellers or any Affiliate, director, officer, manager or employee of the Company or the Sellers or any individual related by blood, marriage, or adoption to any such director, officer, manager, employee, or Affiliate, nor any entity in which any such director, officer, manager, employee, or Affiliate owns any beneficial interest (a "**Related Party**"), (b) no Related Party owns any property, tangible or intangible, that is used by the Company to conduct its business, (c) no Related Party owes any money to, or is owed any money by, the Company and (d) no Related Party has any financial interest, direct or indirect, in any competitor, supplier, distributor, or customer of, or other business which has any transactions or other business relationship with, the Company.

**2.23** **No Undisclosed Liabilities**. Except as disclosed on **Schedule 2.23**, the Company does not have any Liability whatsoever, asserted or unasserted, liquidated or unliquidated, accrued, absolute, contingent, or otherwise, other than (a) those which are reflected or reserved against in the balance sheets included in Financial Statements; (b) those that were incurred in the Ordinary Course since December 31, 2023, and (c) obligations of future performance (and, to avoid doubt, not for breach) under any Contracts set forth on a Disclosure Schedule hereto and under other Contracts entered into in the Ordinary Course that are not required to be listed on any Disclosure Schedule to this Agreement, or arising pursuant to Laws or Information Requirements.

- 31 -

**2.24    Brokers**.  Other than New Direction Partners, LLC, whose costs and fees will be paid solely by the Sellers, the Company is under no obligation to pay any broker's fee, finder's fee or commission or other compensation to any finder, broker, agent, or other intermediary in connection with the negotiation of this Agreement or the consummation of the Transactions.

**2.25    Bank Accounts**.  **Schedule 2.25(a)** sets forth a list of the locations and numbers of all bank accounts, investment accounts and safe deposit boxes maintained by the Company, or the Sellers or an Affiliate thereof on behalf of the Business, together with the names of all Persons who are authorized signatories or have access thereto or control thereunder.  **Schedule 2.25(b)** sets forth a list of all such accounts into which (a) payments in respect of Accounts Receivable are made or (b) any third parties make recurring payments in respect of Accounts Receivable.

**2.26    Customers and Suppliers**.  **Schedule 2.26** sets forth a true, complete, and correct list, by division, of the twenty (20) largest customers of the Business and the ten (10) largest suppliers (including subcontractors to the Business under any Contracts) of the Business by volume of sales and purchases, respectively (by dollar volume) for each of calendar years 2022 and 2023.  Neither the Sellers nor the Company have received any written notice from any supplier to the effect that, and to the knowledge of the Company, there is no reason to believe that, any such supplier will stop or decrease, or plans to stop or decrease, the rate of supplying materials, products, or services to the Business.  Except as set forth on **Schedule 2.26**, neither the Sellers nor the Company have received any written notice from any customer to the effect that, and to the knowledge of the Company, has no reason to believe that, such customer will stop or decrease, or plans to stop or decrease, the rate of buying materials, services, or products from the Company.  Neither the Sellers, with respect to the Business, nor the Company is involved in any material dispute with any customer or supplier, nor, to the knowledge of the Company, is there any basis for any such dispute, that is not resolved.

**2.27    Anti-Corruption Matters**.  Each of the Sellers, the Company and its directors, officers, managers, employees, agents, consultants, distributors, and others working on their behalf has complied with all Legal Requirements relating to anti-corruption and anti-bribery in all material respects and has not (a) used any corporate funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity, (b) directly or indirectly, made, offered or authorized any unlawful payment to foreign or domestic government officials or employees (including officials and employees of state owned or operated facilities), or (c) directly or indirectly, made, offered or authorized any improper bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment.  Neither the Company nor any Person on behalf of the Company has made any donation to any political party or any incumbent government since the Reference Date.

**2.28    Disclosure**.  The information required to be provided by the Sellers pursuant to  this Agreement, including, without limitation, the schedules hereto, does not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated herein or therein or necessary to make the statements and facts contained herein or therein, in light of the circumstances under which they are made, not false or misleading. Copies of all documents heretofore or hereafter delivered or Made Available by the Sellers to the Buyer pursuant hereto were or will be complete and accurate copies of such documents.

**2.29    Accuracy and Materiality of Representations, Warranties and Covenants.**  No representation, warranty or covenant of the Sellers contained in this Agreement, or any other document prepared by the Sellers and required to be delivered to Buyer pursuant to this Agreement contains any untrue statements of a material fact, or fails to state a material fact necessary in order to make the statements made in this Agreement or such document not misleading.  Each of the representations, warranties and

- 32 -

covenants contained in this <u>ARTICLE II</u> and in <u>ARTICLE III</u> shall be deemed to be material to and have been relied upon by Buyer and shall be binding and enforceable against the Sellers.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES CONCERNING THE SELLER

The Sellers, severally and jointly, represent and warrant that each of the statements contained in <u>ARTICLE III</u> is true and correct.

**3.1    Title**.  Each Seller owns, beneficially and of record, the Equity Interests reflected as being owned by each Seller on **Schedule 2.7**, free and clear of all Liens other than restrictions on transfers under applicable securities laws.  Each Seller has the right, power and authority to transfer all of the Purchased Securities to the Buyer, free and clear of any Liens other than restrictions on transfers under applicable securities laws.

**3.2    Organization and Authority**.  Each Seller is a limited liability company duly organized, validly existing and in good standing under the laws of its state of formation, with all requisite power and authority to own its properties and to carry on its business as such business is now conducted. Each Seller has full power and authority and has taken all required action on its part necessary to permit it to execute and deliver and carry out the terms of this Agreement and the other agreements, instrument and documents of each Seller contemplated hereby or by the Transactions.  The execution and delivery of this Agreement and all Transaction Documents to which each Seller is or will be a party, and performance by each Seller of the terms thereof and the consummation by each Seller of the Transactions have been duly and validly authorized by all requisite action on the part of each Seller.

**3.3    No Conflict**.

**(a)**    Except as set forth on **Schedule 3.3(a)**, no consent, order, authorization, approval, notice, declaration or filing of or with any Governmental Authority, or any other Person, is required on the part of each Seller for or in connection with the execution, delivery or performance by each Seller of this Agreement and the other agreements, documents and instruments of each Seller contemplated hereby to which each Seller is a party or the consummation by each Seller of the Transactions.

**(b)**    The execution, delivery and performance of this Agreement and the other agreements, documents and instruments contemplated hereby by each Seller will not result in any breach or violation of, be in conflict with, constitute a default or an event that, with or without notice or a lapse of time or both, would constitute a default under, or cause the acceleration of any obligation or loss of any rights under any (i) Legal Requirement, (ii) Organizational Document or (iii) Contract or Permit to which the Seller is a party or by which the Seller is bound.

**3.4    Enforceability**.  This Agreement is, and each of the other agreements, documents and instruments contemplated hereby to which each Seller is a party shall be when executed and delivered by each Seller, the valid and binding obligations of each Seller enforceable in accordance with its terms, except as limited by the Remedies Exceptions.

**3.5    No Brokers**.  Other than New Direction Partners, LLC, whose costs and fees will be paid solely by the Sellers, such Seller is under no obligation to pay any broker's fee, finder's fee or commission or other compensation to any finder, broker, agent, or other intermediary in connection with the negotiation of this Agreement or the consummation of the Transactions.

**3.6    Litigation**.  There is no (a) Legal Proceeding pending and served or, to the knowledge of each Seller, threatened in writing against such Seller, (b) audit, examination or investigation by any Governmental Authority pending or, to the knowledge of such Seller, threatened in writing against such Seller, (c) Legal Proceeding pending by such Seller against any third party or (d) outstanding order, injunction, judgment, decree or ruling of any Governmental Authority imposed or, to the knowledge of the Company, threatened in writing upon such Seller, in each case under clauses (a) – (d) only to the extent relating to the Business or the Company.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES CONCERNING THE BUYER

The Buyer represents and warrants to the Company and the Sellers that each of the statements contained in this ARTICLE IV is true and correct.

**4.1    Organization, Power and Standing**.  The Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada, with all requisite power and authority to own its properties and to carry on its business as such business is now conducted.

**4.2    Power and Authority; No-Conflict**.  (a) The Buyer has full power and authority and has taken all required action on its part necessary to permit it to execute and deliver and to carry out the terms of this Agreement and the other agreements, documents and instruments contemplated hereby to which it is a party.  (b) The execution, delivery and performance of this Agreement and the Transaction Documents to which it is a party will not result in any violation of, be in conflict with, or constitute a default under any (i) Legal Requirement, (ii) Organizational Document or (iii) Contract or Permit to which the Buyer is a party or by which the Buyer is bound.

**4.3    Consents and Approvals**.  Except as set forth on **Schedule 4.3**, no consent, approval or authorization of or declaration or filing with any Governmental Authority or non-Governmental Authority or any party to any contract with the Buyer is required on the part of the Buyer for or in connection with its execution, delivery or performance of this Agreement and the Transaction Documents contemplated hereby to which it is a party.

**4.4    Validity and Enforceability**.  This Agreement is, and each of the other agreements, documents and instruments contemplated hereby to which the Buyer is a party shall be when executed and delivered by the Buyer, the valid and binding obligations of the Buyer enforceable in accordance with its terms, except as limited by the Remedies Exceptions.

**4.5    Brokers**.  No finder, broker, agent, financial advisor or other intermediary has acted on behalf of the Buyer in connection with the negotiation or consummation of this Agreement or the Transactions and no such Person is entitled to any fee, payment, commission or other consideration in connection therewith as a result of any arrangement made by any of them.

**4.6    No Litigation**.  As of the date hereof, there is no Legal Proceeding pending or, to the knowledge of the Buyer, threatened against the Buyer that challenges or could reasonably be expected to challenge the validity of this Agreement or the other Transaction Documents contemplated hereby or that would be reasonably likely to adversely affect or restrict the Buyer's ability to consummate the Transactions.

**4.7    Disclosure**. The information required to be provided by the Buyer pursuant to this Agreement does not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated herein or therein or necessary to make the statements and facts contained herein

or therein, in light of the circumstances under which they are made, not false or misleading. Copies of all documents heretofore or hereafter delivered or made available by the Buyer to the Sellers pursuant hereto were or will be complete and accurate copies of such documents.

**4.8    Accuracy and Materiality of Representations, Warranties and Covenants.** No representation, warranty or covenant of the Buyer contained in this Agreement, or any other document prepared by the Buyer and required to be delivered to the Sellers pursuant to this Agreement contains any untrue statements of a material fact, or fails to state a material fact necessary in order to make the statements made in this Agreement or such document not misleading.  Each of the representations, warranties and covenants contained in this ARTICLE IV shall be deemed to be material to and have been relied upon by the Sellers and shall be binding and enforceable against the Buyer.

# ARTICLE V
# COVENANTS

**5.1    Confidentiality**.  Each of the Owner and the Sellers hereby agrees that neither it nor any of its Affiliates (other than the Company post-Closing) shall use or disclose to anyone, except authorized personnel of the Buyer, any trade secrets or other confidential materials or information concerning the Company or the Business, including, without limitation, secrets, customer lists and credit records, employee data, sales representatives and their territories, mailing lists, consultant arrangements, pricing policies, operational methods, marketing plans or strategies, product development and techniques or plans, product formulas and designs, research and development programs and plans, business acquisition plans, new personnel acquisition plans, designs and design projects, any Intellectual Property (unless previously publicly disclosed in a manner which would not and does not constitute a breach of this Agreement or any other relevant agreement or obligation of confidentiality) and any other research or business information which the Business or the Company currently treats as confidential (whether or not a trade secret under applicable Legal Requirements).  If the Owner, any Seller or any of their Affiliates is or may be obligated to disclose any such trade secret or confidential information pursuant to applicable law, regulation or legal process, then the Owner or  such Seller shall provide the Buyer with prompt written notice before any such disclosure sufficient to enable the Buyer either to seek a protective order or other appropriate remedy preventing or prohibiting such disclosure or to waive compliance with the provisions of this Section 5.1. Nothing herein shall prevent the Owner or the Sellers or any of their Affiliates from (a) using such information for the preparation of Tax Returns or in connection with the administration of the Estate of Mr. Karabots, including in connection with the executors' fulfillment of and compliance with their fiduciary duties and in communications with beneficiaries and others involved in the administration of the estate, including the Attorney General of the Commonwealth of Pennsylvania, other offices of the Commonwealth of Pennsylvania and their representatives, or (b) disclosing information that is generally available to the public (other than if such availability results from a breach by the Owner or Sellers of this Agreement or any other relevant agreement or obligation of confidentiality).  Notwithstanding anything contained herein to the contrary, each of the Owner and the Sellers shall be responsible for any breach of the terms of this Section 5.1 by any Affiliate, representative or advisor of the Owner or Sellers.  In addition, the existence and terms and conditions of this Agreement shall be deemed to be confidential information and the Sellers and the Buyer hereby agree that without the consent of each other party hereto, the terms hereof shall not be disclosed to anyone, except for representatives of the Sellers and the Buyer; provided that, for the avoidance of doubt, nothing in this Section 5.1 shall prevent or prohibit Buyer from disclosing any information regarding the Company or its ownership thereof after the Closing, provided that this does not include the terms or conditions of the sale of the Business.

5.2     **Tax Matters**.

(a)     **Allocation.** Within ninety (90) days after the determination of the Final Purchase Price pursuant to Section 1.5, the Buyer shall prepare and deliver to the Sellers' Representative for its review, a schedule allocating the total amount of the Purchase Price and the liabilities of the Company, to the extent such liabilities are included in "amount realized" for Tax purposes, among the assets of the Company and the covenants set forth in Section 5.5 in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder (and any similar provision of state, local or foreign law, as appropriate) (the "**Allocation**"), and shall provide the Sellers' Representative with a copy of any appraisal, report or other documentation, if any, supporting the values used for such Allocation. The Sellers' Representative shall have the right, for thirty (30) days after such delivery, to provide reasonable, written comments to such draft Allocation. If the Sellers' Representative provides written comments to the draft Allocation within such thirty (30) day period, the Buyer and the Sellers' Representative shall negotiate in good faith for thirty (30) days after such comments are delivered in an attempt to resolve any disagreements between them with respect to such draft Allocation. If the Sellers' Representative does not object to such draft Allocation within such thirty (30) day period, or if the Buyer and the Sellers' Representative resolve any disagreements between them with respect to such draft Allocation, (i) such Allocation (as revised, if applicable) shall be final binding on the parties for federal, state, local and other Tax purposes, (ii) the parties shall report the transactions consummated pursuant to this Agreement in a manner consistent with such final Allocation on all Tax Returns (including IRS Form 8594) and take no Tax position contrary thereto, (iii) any subsequent adjustments to the Purchase Price shall be reflected in amendments to the Allocation made in accordance with the principles set forth in Treasury regulations § 1.1060-1, and (iv) in the event that the final Allocation is disputed by any Governmental Authority, the party receiving notice of such dispute will promptly notify the other parties, and the parties will consult in good faith how to resolve such dispute in a manner consistent with the Allocation. If the Buyer and the Sellers' Representative are unable to resolve all such disagreements with respect to the draft Allocation, then the Allocation shall not be binding on the parties.

(b)     **Tax Returns.**

(i)     The Sellers shall prepare, or cause to be prepared, and file, or cause to be filed, any Income Tax Returns required to be filed by the Company for any taxable period ending on or prior to the Closing Date. All such Income Tax Returns shall be prepared in a manner consistent with past practice, except as otherwise required by law. If necessary, the Buyer shall cooperate with the Sellers in filing any such Income Tax Returns.

(ii)     Except as otherwise provided in Section 5.2(b)(i), the Buyer shall prepare and file or cause to be prepared and filed all Tax Returns required to be filed by the Company after the Closing Date. All such Tax Returns with respect to a Pre-Closing Tax Period or a Straddle Period shall be prepared in a manner consistent with the past practice of the Company, except to the extent otherwise required by law, and shall be submitted to the Sellers' Representative for review and comment at least fifteen (15) days prior to the due date thereof.

(iii)     All Taxes payable by the Company in respect of any Pre-Closing Tax Period are the responsibility of and shall be paid by the Sellers, except to the extent paid prior to the Closing Date or taken into account as a reduction to the Purchase Price as a result of inclusion in the calculation of Final Closing Indebtedness or Final Transaction Expenses, and shall be paid to the Buyer at least five (5) days prior to the date on which such Taxes are due. Taxes allocable to the portion of the Straddle Period ending on the Closing Date are the responsibility of the Sellers. The Sellers shall pay to the Buyer at least five (5) days prior to the date on which the Taxes are due with respect to any Straddle Period an amount equal to the portion of such Taxes that are the

- 36 -

responsibility of Sellers, except to the extent such Taxes are paid prior to Closing or were taken into account in the calculation as a reduction to the Purchase Price as a result of inclusion in the calculation of Final Closing Indebtedness or Final Transaction Expenses.  For purposes of this Agreement, for any Taxes relating to a Straddle Period, the portion of such Tax that shall be treated as allocable to the portion of the Straddle Period ending on the Closing Date shall (x) in the case of property, ad valorem and other Taxes imposed on a periodic basis, be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the Tax period up to and including the Closing Date and the denominator of which is the number of days in the entire Tax period, and (y) in the case of any Tax based upon or related to income, gains, receipts, gross margins, employment, sales, use or other Taxes imposed on a non-periodic basis, be deemed equal to the amount that would be payable if the relevant Tax period ended as of the end of the Closing Date pursuant to an interim closing-of-the-books. Any Tax credits relating to a Straddle Period shall be taken into account as though the relevant Tax period ended on the Closing Date.  All determinations necessary to give effect to the allocations described in this Section 5.2(b)(iii) shall be made in a manner consistent with past practice.

(iv)    All refunds or rebates of Taxes paid by the Company in respect of any Pre-Closing Tax Period shall belong to the Sellers and shall be paid over (net of any expenses incurred in obtaining such refund or rebate) to the Sellers within fifteen (15) days of receipt thereof or the date such amount is claimed as a credit against Taxes of a subsequent period. Any refund or rebate of Taxes with respect to a Straddle Period shall be apportioned between the Pre-Closing Tax Period and post-closing Tax period in accordance with Section 5.2(b)(iii). In the event any refund or rebate paid to the Sellers pursuant to this Section 5.2(b)(iv) is subsequently disallowed, in whole or in part, such disallowed amount (and any applicable penalties and interest) shall be reimbursed to Buyer within fifteen (15) days of Seller receiving notification of such disallowance (and the resolution of any Contest with respect thereto).

(c)    **Cooperation on Tax Matters**.  The Buyer, the Company and the Sellers shall cooperate fully, to the extent reasonably requested by another, in connection with the preparation and filing of Tax Returns pursuant to Section 5.2(b) or otherwise, and shall assist and cooperate with each other in preparing for any dispute, audit, examination, litigation, or other proceeding with respect to Taxes with respect to a Pre-Closing Tax Period or Straddle Period (a "**Contest**").  Such cooperation shall include the retention and (upon another party's request) the provision of records and information which are reasonably relevant to any such Tax Return filing or Contest and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder.  Any Contest shall be deemed to be a third-party claim subject to the procedures set forth in Section 7.5 of this Agreement.

(d)    **Transfer Taxes**.  All transfer, documentary, sales, use, real property gains, stamp and registration Taxes incurred in connection with the transfer of the Purchased Securities pursuant to this Agreement shall be borne fifty percent (50%) by the Sellers and fifty percent (50%) by the Buyer.  The Sellers will file all necessary Tax Returns and other documentation with respect to all such Taxes, and, if required by applicable law, the Buyer and the Company will join in the execution of any such Tax Returns and other documentation. The Buyer and the Sellers agree to use commercially reasonable efforts to obtain any certificate, including a resale certificate, or other document from any Tax authority as may be necessary to mitigate, reduce or eliminate any such Taxes.

**5.3**    **[Intentionally Omitted]**.

**5.4**    **Books and Records**.  After the Closing, for a period of five (5) years from the Closing (or, with respect to any books and records related to any Taxes, the period ending 90 days after the expiration of all applicable statutes of limitations), the Buyer shall, and shall cause the Company to, provide the Sellers

- 37 -

and their accountants, lawyers and representatives access to the books and records of the Company in the Buyer's possession, in each case to the extent relating to periods prior to the Closing, upon their reasonable request during normal business hours (at the applicable Seller's sole cost and expense) and in all events subject to applicable Legal Requirements and to the Buyer's and the Company's policies with respect to access to their respective facilities from time to time, in connection with any litigation, accounting or other legitimate non-competitive business purposes (as determined by Buyer, acting reasonably) (other than any litigation or dispute between the Seller, on the one hand, and Buyer and its Affiliates (including the Company), on the other hand, related to this Agreement or the Transaction, which would be governed by and subject to other applicable provisions of this Agreement and subject to applicable rules relating to discovery and document retention); *provided*, *however*, that in no event shall the Buyer or its Affiliates (including the Company) be required to take any action that would constitute a waiver of the attorney-client or other privilege or would compromise such party's confidential information; *provided*, *further*, that in no event shall the Buyer or its Affiliates be required to supply Sellers or their accountants, lawyers and representatives with any information that the Buyer or its Affiliates (including the Company) (in the Buyer's reasonable judgment) are under a legal obligation not to supply.

### 5.5    Restrictive Covenants.

(a)    Each of the Owner and the Sellers agrees that, in light of (x) the Buyer's substantial investment in the assets of the Business, including its good will, customer relationships, employee relationships, Intellectual Property and other proprietary and/or confidential information, and (y) the Buyer's present intent to expand upon the scope, geographic, industry, types of services and otherwise, of the Business's relationships with its current and former customers, as a condition precedent to the Buyer's obligations to enter into and perform its obligations under the Transaction Documents, for a period of three (3) years commencing on the Closing Date, neither Owner nor any Seller shall, and shall cause its Affiliates not to, directly or indirectly, either for itself, himself, herself or any other Person, without the prior written consent of the Buyer:

(i)    own, consult for, provide services to, engage in sales or marketing for, manage, operate, finance, join, control, participate in, be employed by, permit its, his, or her name to be used by, or be connected to, or otherwise have any direct or indirect interest in, whether as a manager, officer, director, employee, partner, principal, sole proprietor, agent, broker, representative, independent contractor, consultant, franchisor, franchisee, creditor, shareholder, owner, joint venture partner, or otherwise, (x) any Person or business that competes, directly or indirectly, with the Business ("**Competing Business**") or (y) any business engaged in a type of business planned within the 12-month period immediately preceding the Closing Date to be entered into by the Company following the Closing Date, in each case, throughout North America; *provided, however*, that the foregoing does not prohibit (A) the Buyer or its Affiliates (including the Company) engaging the Owner, any Seller, or their Affiliates as a service provider of the Buyer or its Affiliates (including the Company), or (B) Owner or any Seller's ownership of two percent (2%) or less of the stock of a publicly held corporation whose stock is traded on a nationally or internationally recognized securities exchange, automated dealer quotation system or in a U.S. or foreign over-the-counter-market;

(ii)    (A) induce or solicit, or attempt to induce or solicit, any then-current or past (within the preceding 12 months, as applicable to such time) employee or contractor of the Company or any of the JAL Affiliates to leave the employ of the Company (or such JAL Affiliate), or to accept employment with, provide services to, or partner with another Person, (B) in any way interfere with the relationship between the Company or any of the JAL Affiliates, on the one hand, and any such employee or contractor thereof, on the other hand, in a way that may result in the impairment or termination of the relationship, or (C) hire or attempt to hire any then-current or past (within the preceding 12 months, as applicable to such time) employee or contractor of the Company or any of the JAL Affiliates; or

- 38 -

**(iii)** except as an employee or contractor of the Company, call on, sell to, perform services for, serve, attempt to persuade, contact, communicate with, or solicit any customer, prospective customer (i.e. a Person that is a potential customer of the Company that the Owner or any Seller has assisted the Company in contacting for the purpose of becoming a customer), client, strategic partner, joint venture partner, vendor, supplier, consultant, contractor, licensee, licensor, bona fide potential acquisition or investment target, or other material business relation (collectively, "**Excluded Persons**") of the Company or any of the JAL Affiliates (including any Excluded Persons of the Company at any time during the 12 month period immediately prior to the Closing Date), in order to induce or attempt to induce such Excluded Person to utilize the services of a Competing Business or cease doing business with the Company or any of the JAL Affiliates, or in any way materially interfere with the relationship between any Excluded Person and the Company and the JAL Affiliates.

Notwithstanding the foregoing, (x) the placement of general advertisement that may be targeted to a particular geographic or technical area, but is not targeted specifically towards employees or contractors of the Company or any of its Affiliates will not be deemed to breach the non-solicit provisions of Section 5.5(a)(ii); *provided* that the preceding clause will not limit or otherwise modify the prohibitions against hiring set forth in Section 5.5(a)(ii)(C), and (y) until such time as either the Buyer or an Affiliate of the Buyer acquires the assets of the Craftline Entities, or in the event neither the Buyer nor an Affiliate of the Buyer acquires the assets of such entities, the Craftline Entities and the operation of their respective businesses as conducted on the date hereof shall not be subject to or bound by the restrictions set forth in Section 5.5(a)(i) and Section 5.5(a)(iii) and the operation of the Craftline Entities by the Sellers or any their respective Affiliates in accordance with the manner in which such businesses are operated on the date hereof will not be deemed to breach the non-compete provisions of Section 5.5(a)(i) or the non-solicit provisions of Section 5.5(a)(iii); *provided* that neither the Sellers nor their respective Affiliates shall induce or attempt to induce any Excluded Persons to cease doing business with the Company, or interfere with the relationship between any Excluded Person and the Company.

**(b)** Each of the Owner and the Sellers acknowledges and agrees that the covenants set forth in this Section 5.5 (collectively, the "**Restrictions**") are reasonably designed to protect the Buyer's substantial investment in the acquisition of the Company and are reasonable with respect to their duration, geographical area, and scope. It is the desire and intent of the parties hereto that the provisions of this Section 5.5 be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought, and each party hereby consents to the jurisdiction of the state, provincial, and federal courts in any such jurisdiction. If any particular provision(s) or portion of this Section 5.5 is adjudicated to be invalid or unenforceable, such provision(s) or portion of this Section 5.5 shall be enforced to the fullest extent permitted by law and the remainder of this Section 5.5 remain in full force and effect, such amendment to apply only with respect to the operation of this Section 5.5 in the particular jurisdiction in which such adjudication is made.

**5.6** **Cash Sweep**. Prior to Closing, Sellers will transfer substantially all of Company's cash from Company to Sellers such that the Closing Cash shall be not more than $0.

**5.7** **Kappa Name.** Except as otherwise expressly provided in this Agreement, from and after the Closing, the Sellers shall not, and shall cause their respective Affiliates not to, use any of the trade names, trademarks, service marks, logos or domain names incorporating the name "Kappa" in connection with any activities that directly compete with the Business; *provided* that the parties acknowledge and agree that Sellers' and their Affiliates' 401(k) plan may continue to use the name "401(k) Plan Kappa Group of Companies."

**5.8** **"K" Trademark**. Notwithstanding anything to the contrary in this Agreement, the parties acknowledge that the Company does not own a trademark for the standalone letter "K" inside of a box. To

- 39 -

the extent the Sellers or their Affiliates own such trademark or have any rights in the standalone letter "K" inside of a box, the Sellers, on behalf of themselves and their Affiliates, hereby grant a one (1) year, non-exclusive, royalty-free license to the Company to use such letter "K" inside of a box in conjunction with the logos set forth on **Schedule 5.8**, which are the logos currently used by the Company in connection with the Business (updated, as needed, to reflect the name change of Kappa Graphics, L.P. to Kappa Graphics, LLC).

**5.9     Post-Closing 401(k) Contribution**. Sellers or an ERISA Affiliate, other than the Company, shall contribute a matching contribution to the 401(k) Plan For The Kappa Group of Companies (the "**401(k) Plan**") for the plan year ending in 2023 in an amount equal to twenty-five percent (25%) of the employee salary deferrals thereunder made by a participant who is an employee of the Company and who is otherwise entitled to receive the matching contribution pursuant to the terms of the 401(k) Plan. Neither Buyer nor the Company shall have any obligation to fund such contributions to the 401(k) Plan with respect to employees of the Company. The Buyer and the Sellers acknowledge and agree that the matching contribution amount will not be included in the calculation of the Purchase Price.

**5.10     COBRA**. The Buyer shall or shall cause the Company to assume all obligations and Liabilities pertaining to COBRA continuation coverage for any Employee arising prior to or due to the Closing Date, including making offers of COBRA continuation coverage under a health plan maintained by the Buyer or the Company to any "qualified beneficiary" (as defined in Treasury Regulations §54.4980B-3 Q/A-1) (i) who is receiving COBRA continuation coverage under any Employee Plan as of the Closing Date, or (ii) who become entitled to receive an offer of COBRA continuation coverage prior to or due to the Closing and whose COBRA "election period" (as defined in Section 4980B(f)(1) of the Code) did not expire prior to the Closing, including but not limited to Employees receiving long-term disability benefits under an Employee Plan who are receiving COBRA continuation coverage under an Employee Plan as of the Closing Date.

**ARTICLE VI**
**CLOSING DELIVERIES**

**6.1     Deliveries by Seller**.  At the Closing, the Sellers shall deliver to the Buyer the following:

**(a)**      a properly executed and duly completed IRS Form W-9 with respect to each Seller, each payee of Closing Indebtedness, and each payee of Closing Transaction Expenses;

**(b)**      written resignations, effective as of the Closing Date and subject to the Closing, of such officers and managers of the Company as may be requested by the Buyer at least five (5) days prior to the Closing, in form and substance reasonably satisfactory to the Buyer;

**(c)**      a copy, certified by a duly authorized officer of Kappa Graphics, to be true, complete and correct as of the Closing Date, of the Organizational Documents of Kappa Graphics, and of the resolutions of the sole member of Kappa Graphics authorizing and approving the Transaction Documents and the Transactions, each in form and substance reasonably satisfactory to the Buyer;

**(d)**      a copy, certified by a duly authorized officer of KPFS, to be true, complete and correct as of the Closing Date, of the Organizational Documents of KPFS, and of the resolutions of the sole member of KPFS authorizing and approving the Transaction Documents and the Transactions, each in form and substance reasonably satisfactory to the Buyer;

**(e)**      a copy, certified by a duly authorized officer or manager of Kappa Graphics Holdco, to be true, complete and correct as of the Closing Date, of the Organizational Documents of Kappa

- 40 -

Graphics Holdco, and of the resolutions of the managers of Kappa Graphics Holdco authorizing and approving the Transaction Documents and the Transactions, each in form and substance reasonably satisfactory to the Buyer;

(f)    a copy, certified by a duly authorized officer or manager of KPFS Holdco, to be true, complete and correct as of the Closing Date, of the Organizational Documents of KPFS Holdco, and of the resolutions of the managers of KPFS Holdco authorizing and approving the Transaction Documents and the Transactions, each in form and substance reasonably satisfactory to Buyer;

(g)    all consents and approvals required to be obtained from any Governmental Authority and from third parties under Contracts with respect to the transactions contemplated by this Agreement, including those consents and approvals set forth on **Schedule 2.5**;

(h)    evidence of the release, cancellation, and termination of all transactions and accounts among the Sellers and their Affiliates (other than the Company), on the one hand, and the Company, on the other hand, without Liability or Loss to the Company, in form and substance reasonably satisfactory to the Buyer;

(i)    evidence of the repayment in full in accordance with the terms thereof, of all Indebtedness owed by the Sellers or any Affiliate of the Sellers to the Company, in form and substance reasonably satisfactory to the Buyer;

(j)    assignments of Equity Interests in the form mutually agreed by the parties hereto, conveying to the Buyer all of the Purchased Securities, free and clear of all Liens, duly executed by each of the Sellers;

(k)    a transition  consulting agreement by and between each of Scott Thorell and Andrea Durloc and the Company in a form mutually agreed by the parties thereto (the "**Transition Services Agreements**"), duly executed each of Scott Thorell and Andrea Duloc;

(l)    the fully executed Real Property Purchase Agreement by and between Buyer and Glendi Publications, Inc. with respect to the real property located at 50 Rock Street, Hughestown, PA 18640, evidence reasonably satisfactory to the Buyer of the satisfaction in full of all conditions to closing set forth therein, and copies of all of the closing documents with respect to such sale fully executed and notarized as appropriate, including, but not limited to, the deed conveying such property to AIC Income Fund III Rock, L.L.C.; and

(m)    all equity transfer books, minute books and other limited liability company records of the Company that are not currently in the possession of the Company.

6.2    **Deliveries by Buyer**.  At the Closing, the Buyer shall deliver to the Sellers the following:

(a)    the Transition Services Agreements, duly executed by the Company.

## ARTICLE VII
## SURVIVAL; INDEMNIFICATION

7.1    **Survival**.  The right to bring a claim for any breach or inaccuracy of any of the representations and warranties contained in this Agreement shall survive the Closing only until the Cut-Off Date applicable to such representation and warranty, and no claim for breach or inaccuracy of any

representation or warranty may be brought after the applicable Cut-Off Date with respect to such representation or warranty, except for any claim (a) of which the Sellers has been notified by the Buyer prior to the applicable Cut-Off Date in accordance with Section 7.5, or (b) of which the Buyer has been notified by the Sellers' Representative prior to the applicable Cut-Off Date in accordance with Section 7.5. The covenants and agreements contained in this Agreement shall survive the Closing in accordance with their respective terms and if no term is specified, until one (1) year after they have been performed.  As used herein, the term "**Cut-Off Date**" means the eighteen (18)-month anniversary of the Closing Date; *provided*, that for claims arising out of the representations and warranties contained in Section 2.17 ('*Taxes*') and Section 2.20 ('*Environmental Laws*'), the "**Cut-Off Date**" shall be the date that is thirty (30) days after the expiration of the applicable statute of limitations with respect to the matters set forth therein, and for claims arising out of the representations and warranties contained in Sections 2.4 ('*Due Authorization*'), 2.5(a) ('*No Conflict'*), 2.7 ('*Capitalization*'), the first sentence of 2.12(a) ('*Title*'), 2.24 ('*Brokers*'), 3.1 ('*Title*'), 3.2 ('*Organization and Authority*'), 3.3(a) and 3.3(b)(ii) ('*No Conflict'*), 4.1 ('*Organization, Power and Standing*'), and 4.2(a) and 4.2(b)(ii)('*Power and Authority*') (each, a "**Specific Representation**" and collectively the "**Specific Representations**"), the "**Cut-Off Date**" shall be the five (5)-year anniversary of the Closing Date. The Specific Representations and those representations and warranties contained in Section 2.17 ('*Taxes*') are collectively the "**Fundamental Representations**".

**7.2**    **Indemnification of the Buyer**.

**(a)**    Subject to the other terms of this ARTICLE VII, from and after the Closing, the Sellers shall jointly and severally indemnify and hold the Buyer and its Affiliates (including the Company) and their shareholders, members, directors, managers, officers, partners, employees, successors, assigns, representatives, and agents of each of them in their capacities as such (the "**Buyer Indemnified Parties**") harmless from any and all Losses incurred or to be incurred by the Buyer Indemnified Parties that arise or result from:

**(i)**    any breach of any of the representations or warranties contained in ARTICLE II or ARTICLE III;

**(ii)**    the failure of any Seller or the Owner to perform, or breach by any Seller or the Owner of any of, its covenants or agreements contained herein;

**(iii)**    Pre-Closing Taxes;

**(iv)**    Transaction Expenses, to the extent not included in the Final Transaction Expenses;

**(v)**    any Indebtedness, to the extent not included in the Final Closing Indebtedness;

**(vi)**    claims for contribution, indemnification or expense reimbursement (whether pursuant to any applicable Organizational Documents or otherwise) by or in respect of any current or former employee, officer, director, manager or any other agent of the Company with respect to any matter occurring, arising or with respect to the affairs of the Company prior to the Closing; and

**(vii)**    any matters described on **Schedule 7.2(a)(vii)**.

- 42 -

**(b)**    Any and all claims by the Buyer Indemnified Parties for indemnification pursuant to Section 7.2(a) shall be made by the Buyer pursuant (and subject) to the other provisions of this ARTICLE VII, including the following:

**(i)**    Notwithstanding anything contained herein or elsewhere to the contrary, all "Company Material Adverse Effect," "material" or similar materiality type qualifications contained in the representations and warranties set forth in this Agreement shall be ignored and not given any effect for the indemnification provisions of this Agreement, including, without limitation, for purposes of (i) determining the amount of any Losses incurred with respect to the indemnification provisions hereof, and (ii) determining whether or not a breach of a representation or warranty has occurred, *provided* that this clause (ii) shall not apply to the representations and warranties set forth in Section 2.8(a)(iii) and Section 2.9(a).

**(ii)**    The Sellers shall not have any claim for contribution from or against the Company as a result of any indemnification or other payments made by the Sellers to any of the Buyer Indemnified Parties pursuant to this Agreement.

**7.3**    **Indemnification of the Sellers**.  Subject to the other terms of this ARTICLE VII, from and after the Closing, the Buyer and the Company shall indemnify and hold the Sellers and their respective Affiliates (collectively, the "**Seller Indemnified Parties**") harmless from Losses incurred by Seller Indemnified Parties that arise or result from (a) any breach or inaccuracy of any of the representations and warranties of the Buyer contained in this Agreement; (b) the failure of the Buyer to perform, or breach by Buyer of any of, its covenants or agreements contained herein, or (c) the operation of the Company and the Business after Closing.

**7.4**    **Certain Limitations.** The indemnification provided for in this ARTICLE VII shall be subject to the following limitations:

**(a)**    No claim for Losses for any claims pursuant to Section 7.2(a)(i) may be made for indemnification hereunder if the amount of such claim, or series of related claims or matters arising from the same facts and circumstances, individually or in the aggregate, does not exceed Ten Thousand Dollars ($10,000) (the "**De Minimis Amount**"), it being understood that a claim for Losses that does not exceed the De Minimis Amount will not count towards satisfaction of the Deductible; provided, however, that the De Minimis Amount will not apply with respect to claims for indemnification arising out of or based on a claim for Fraud or breach of a Fundamental Representation.

**(b)**    Except in the case of claims based on Fraud or breach of a Fundamental Representation, the Sellers shall not be liable for any Losses with respect to matters set forth in Section 7.2(a)(i) until the aggregate amount of all such Losses (after application of Section 7.4(a)) for such matters exceeds $50,000 (the "**Deductible**"), in which case the Sellers shall be liable for all Losses indemnifiable under Section 7.2(a)(i) in excess of the Deductible.

**(c)**    Except in the case of claims based on Fraud or breach of a Fundamental Representation, the aggregate amount of all Losses for which the Sellers shall be liable pursuant to Section 7.2(a)(i) shall not exceed $700,000.

**(d)**    The aggregate amount of Losses for which the Sellers shall be liable pursuant to this ARTICLE VII, except for a claim based on Fraud, shall not exceed the Final Purchase Price (as finally determined in accordance with Section 1.5) (the "**Purchase Price Cap**").

(e)     The aggregate amount of Losses for which the Buyer shall be liable pursuant to this <u>ARTICLE VII</u> shall not exceed the Purchase Price Cap.

(f)     The amount of any Losses for which indemnification is provided under this Article VII shall be reduced by (i) any Tax benefits actually realized by an indemnified party with respect to the applicable Losses prior to the applicable indemnification payment and the two succeeding taxable years; and (ii) any amounts actually recovered by the indemnified party under any insurance policies, including the insurance policy related to the Payroll Incident (as defined in the Disclosure Schedules), net of any related deductible and the costs and expenses borne by the indemnified party in making such recoveries (including any documented premium increases attributable thereto or other costs of such insurance policies resulting from pursuing such claim thereunder). If an indemnified party (or an Affiliate thereof) receives any insurance payment in connection with any claim for Losses for which it has already received an indemnification payment from the Indemnifying Party with respect to all such indemnified party's Losses in connection therewith, it shall promptly reimburse the indemnified party the amount so received (to the extent previously paid by the indemnifying party), net of any deductible and the costs and expenses (including Taxes) borne by the indemnified party in making such recoveries (including any documented premium increases attributable thereto or other costs of such insurance policies resulting from pursuing such claim thereunder).

(g)     Notwithstanding any other provision of this Agreement to the contrary, no indemnifying party shall be liable under this <u>Article VII</u> for any Losses relating to any matter to the extent that the indemnified party shall have otherwise been compensated for such matter pursuant to, or the Loss was taken into account under, any other provision of this Agreement, so as to avoid duplication or "double counting" of the same Loss.

**7.5     Procedure for Indemnification**.

(a)     Any party hereto entitled to make a claim for indemnification hereunder shall as promptly as reasonably practical notify the indemnifying party of the claim in writing upon learning of such claim or the facts constituting such claim, describing the claim and related facts (to the extent then known) in reasonable detail, the amount thereof (if known or, if unknown and estimable, a reasonable estimate thereof), and the basis therefor; provided that the indemnifying party will not be relieved of its indemnification obligations hereunder except to the extent that it is materially prejudiced by the indemnified party's failure to give such reasonably prompt notice. The party from whom indemnification is sought shall respond to each such claim within thirty (30) days of receipt of such notice (the "**Response Period**"). No action shall be taken by the party seeking indemnification that would prejudice the rights of the indemnifying party (unless reasonably necessary to protect the rights of the party seeking indemnification) until the expiration of the Response Period.

(b)     If a claim for indemnification hereunder is based on a claim by a third party, the indemnifying party shall have the right, upon written notice to the party seeking indemnification prior to the expiration of the Response Period, to assume control of the defense thereof including, at its own expense, employment of counsel reasonably satisfactory to the party seeking indemnification; *provided*, that the indemnifying party has, subject to the limitations set forth herein, unconditionally acknowledged to the party seeking indemnification in writing its obligation to indemnify the Persons to be indemnified hereunder with respect to such claim and to discharge any cost or expense arising out of such investigation, contest, or settlement; and *provided*, further, that the indemnified party may participate in such defense and related matters and proceedings (including settlements) with counsel of its choice at its own expense, unless separate representation is necessary to avoid a conflict of interest, in which case such representation shall be at the expense of the indemnifying party. If the indemnifying party does not assume the defense of any claim pursuant to this <u>Section 7.5</u>, or does not acknowledge its obligation to indemnify the party seeking

indemnification, the party seeking indemnification shall have the right, at its option, to assume and control defense of the matter and to look to the indemnifying party for the full amount of the reasonable costs of defense. With respect to any claim by a third party, the party controlling the defense thereof shall have the right to settle or resolve any such claim; *provided*, that any such settlement or resolution contemplated by an indemnifying party shall not be concluded without the prior written approval of the indemnified party unless (i) there is no finding or admission of any violation of any Legal Requirement or any violation of the rights of any Person; (ii) the sole relief provided is monetary damages that are paid in full by the indemnifying party; and (iii) such settlement does not involve a customer, vendor or supplier listed on Schedule 2.26 or any other material business relation of the Buyer or the Company; and *provided* further that any such settlement or resolution contemplated by an indemnified party shall not be concluded without the prior written approval of the indemnifying party unless the indemnifying party had the right to but failed to assume the defense of such claim pursuant to this Section 7.5(b).

(c)     The party claiming indemnification and the indemnifying party shall cooperate in good faith with respect to resolving any claim or liability which one party is obligated to indemnify the other party under this ARTICLE VII. Such cooperation shall include using commercially reasonable efforts to (i) assist in the collection and preparation of discovery materials, (ii) meet with (and making employees available to meet with) the indemnifying party and/or its counsel to prepare for and/or appear as witnesses at depositions, court proceedings and/or trial, (iii) providing to indemnifying party and/or its counsel such information under the control of the indemnified party that is necessary for the defense or prosecution of such matter, (iv) as promptly as reasonably practicable after the indemnified party's receipt thereof, providing to the indemnifying party and/or its counsel copies of all notices and documents (including court papers) received by an indemnified party relating to any third party claim, and (v) if necessary, cooperate with the Sellers' Representative to make any supplemental or amended tax or other filings or notifications that the Sellers' Representative concludes are reasonably necessary under the circumstances.

(d)     Notwithstanding anything to the contrary contained in this Section 7.5, the indemnifying party shall not be entitled to control, but may participate in, and the indemnified party shall be entitled to have sole control, including the right to select defense counsel, over the defense or settlement of any claim (i) that seeks a temporary restraining order, a preliminary or permanent injunction or specific performance against the indemnified party, (ii) that involves criminal allegations against the indemnified party, (iii) that, if unsuccessful, would set a precedent that would materially interfere with, or have a material adverse effect on the business or financial condition of the indemnified party, or (iv) that imposes liability on the part of the indemnified party for which the indemnified party is not entitled to indemnification hereunder. In such event, the indemnifying party will still be subject to its obligations hereunder, and the indemnified party will not settle the subject claim without the prior written consent of the indemnifying party, which consent will not be unreasonably withheld, conditioned or delayed, unless (x) there is no finding or admission by the indemnifying party of any violation of any Legal Requirement or any violation of the rights of any Person; and (y) the sole relief provided is monetary damages for which the indemnified party is not entitled to indemnification hereunder.

7.6     **Determination of Losses**.  As used herein, "**Losses**" means all damages, losses, expenses, costs and Liabilities (including reasonable attorneys' fees and costs of collection).

7.7     **Remedies Exclusive**.  Except (i) as provided in Section 8.15, (ii) for claims related to or arising under the terms of the other Transaction Documents, which shall be governed by the terms of such Transaction Documents, and (iii) for claims arising out of Fraud, the remedies provided in this ARTICLE VII shall be the sole and exclusive remedies of the Buyer Indemnified Parties and the Seller Indemnified Parties and their heirs, successors and permitted assigns after the Closing with respect to this Agreement and the Transactions including any breach or inaccuracy of any representation or warranty or violation of any covenant or agreement contained herein.  Notwithstanding the foregoing or anything to the contrary

- 45 -

otherwise contained herein, nothing in this Agreement shall limit the liability of any Person for Fraud on the part of such Person. Following the Closing, no Buyer Indemnified Party or Seller Indemnified Party shall bring any claim with respect to this Agreement or the Transactions, whether in contract, tort or otherwise, other than (a) as part of the process contemplated by Section 1.5 and subject to the terms thereof, (b) a claim for Fraud against the Person who committed such Fraud, (c) a claim made by the Buyer on behalf of the Buyer Indemnified Parties in accordance with Section 7.2, (d) a claim made by a Seller on behalf of the Seller Indemnified Parties in accordance with Section 7.3, or (e) claims related to or arising under the terms of the Transaction Documents, which shall be governed by the terms of such Transaction Documents. For the sake of clarity, no such claim may be brought against any Non-Party. The provisions of this ARTICLE VII were specifically bargained for and reflected in the total amount of the Purchase Price payable in connection with the Transactions.

7.8    **Tax Treatment of Indemnity Payments**. To the maximum extent permitted by Legal Requirements, the parties shall treat any indemnity payment made under this Agreement as an adjustment to the Purchase Price for all Tax purposes.

7.9    **Holdback Release**.

(a)    Within three (3) business days after the nine (9) month anniversary of the Closing Date, the Buyer shall release to the Sellers' Representative (for the benefit of the Sellers) Three Hundred Fifty Thousand Dollars ($350,000) of the Holdback Amount less the sum of (x) amounts paid from the Holdback Amount to resolve any settled claims for indemnification by the Sellers and (y) any unpaid amounts related to any unresolved indemnification claims made in accordance with this ARTICLE VII (including the amount of any reasonably estimated claim made), and less any amounts of the Holdback Amount retained and setoff against amounts owed to the Buyer pursuant to this Agreement. Within three (3) business days after the eighteen (18) month anniversary of the Closing Date, the Buyer shall release to the Sellers' Representative (for the benefit of the Sellers) the remaining Holdback Amount less any unpaid amounts related to any unresolved indemnification claims (including the amount of any reasonably estimated claim made), and less any amounts of the Holdback Amount retained by Buyer pursuant to this Agreement. After the eighteenth (18) month anniversary of the Closing Date, following Final Determination of any outstanding indemnified amount asserted by the Buyer, the Buyer shall release to the Sellers' Representative (for the benefit of the Sellers) the balance of the Holdback Amount (less any amounts of the Holdback Amount retained by Buyer pursuant to this Agreement, including with respect to any unresolved claims) within three (3) business days. "**Final Determination**" means (1) mutual agreement between the Buyer and the Sellers' Representative, (2) a final non appealable order of any court of competent jurisdiction that may be issued or (3) a final arbitration award that is final and non-appealable and from an arbitrator having proper authority. Notwithstanding anything to the contrary herein, the Buyer's obligation to pay the Holdback Amount to the Sellers' Representative (on behalf of the Sellers), as adjusted, shall survive the Closing Date and shall not be limited in duration.

(b)    Any portion of the Holdback Amount released by the Buyer pursuant to this Section 7.9 shall be made by wire transfer of immediately available funds to an account that has been designated by the Sellers' Representative.

7.10    **Right to Set-Off**. Without prejudice or limitation to any other remedies available to the Buyer, in the event that the Buyer or any Buyer Indemnified Party is entitled to any amounts hereunder or indemnification pursuant to this Agreement, the Buyer may first set-off such amount against any amounts due to the Sellers under this Agreement or otherwise, including the Holdback Amount and the Earn-Out Amount, if any (the "Remaining Payments"). In the event the Buyer or any Buyer Indemnified Party has made a claim for indemnification hereunder and the Sellers' Representative (on behalf of a Seller) disputes its obligation to make such indemnification, the Buyer may nonetheless withhold the amount of such

claimed indemnification from the Remaining Payments until such dispute is resolved by a Final Determination and such withholding shall not be deemed a default by the Buyer hereunder.

## ARTICLE VIII
## MISCELLANEOUS

**8.1**    **Sellers' Representative**.

    **(a)**    Each Seller, by virtue of such Seller's execution of this Agreement and acceptance of any consideration contemplated by ARTICLE I, has irrevocably nominated, constituted and appointed the Sellers' Representative as the agent, agent for service of process and true and lawful attorney-in-fact of such Seller, with full power of substitution, to act in the name, place and stead of such Seller with respect to this Agreement and the Transaction Documents and the taking by the Sellers' Representative of any and all actions (whether prior to, contemporaneously with, or after such nomination, constitution and appointment) and the making of any decisions required or permitted to be taken or made by any Seller or the Sellers' Representative under this Agreement and the Transaction Documents, which in each case and as applicable shall have accordingly been ratified by such Seller, including the exercise of the power to execute, deliver, acknowledge, certify and file (in the name of any or all of the Sellers or otherwise) any and all documents and to take any and all actions that the Sellers' Representative may, in its sole discretion, determine to be necessary, desirable or appropriate on or after the date hereof, including the power to act on behalf of any Seller in any dispute, litigation or arbitration (including in any negotiation, resolution, settlement or compromise) involving this Agreement or any Transaction Document and the power to receive on behalf of, and to distribute (after payment of any unpaid expenses chargeable to a Seller in connection with the transactions contemplated by this Agreement), all amounts payable to such Seller under the terms of this Agreement or any Transaction Document, including each Seller's allocable portion of the Purchase Price as determined by the Sellers' Representative.

    **(b)**    Without limiting the generality of this Section 8.1 and notwithstanding anything to the contrary contained in this Agreement, the Buyer shall be entitled to deal exclusively with the Sellers' Representative on all matters with respect to this Agreement, the transactions contemplated by this Agreement and the Transaction Documents, and rely conclusively (without further evidence of any kind whatsoever) on any document executed or purported to be executed on behalf of or for the benefit of any Seller by the Sellers' Representative, and on any other action taken or purported to be taken by the Sellers' Representative on behalf of any Seller by the Sellers' Representative, as fully binding upon such Seller. All notices delivered by the Buyer or the Company following the Closing to the Sellers' Representative (whether pursuant to this Agreement or otherwise) shall constitute notice to the Sellers.

    **(c)**    Each of the Sellers hereby directs the Buyer to pay all consideration and any other amounts due and payable to any Seller hereunder to the Sellers' Representative in accordance with wire information provided by the Sellers' Representative. Buyer shall not have any liability with respect to payment of any amounts payable hereunder to Sellers' Representative, and the Sellers hereby waive any and all claims they have against the Buyer with respect to receipt of any consideration of payment that is made by the Buyer to the Sellers' Representative.

    **8.2**    **Notices**.  Any notice, demand and communication to a party hereunder shall be in writing and shall be deemed to have been duly given and received (a) if sent via certified mail, return receipt requested, three business days after being mailed, (b) if sent via an internationally recognized overnight delivery service (charges prepaid), one business day after being given to such delivery service, (c) if sent via electronic mail or similar electronic transmission, as of the date sent or (d) if delivered personally or by other means, as of the date sent, and in each case shall be addressed to such party at its address set forth

- 47 -

below (or such other address as it may from time to time designate in a notice given in accordance with this Section 8.2):

If to any Seller or the Sellers' Representative, to:

> P.O. Box 736
> 40 E. Skippack Pike
> Fort Washington, PA 19034
> Attention: William J. Bonner, Jr.
> E-mail: wbonner@spartanorg.com

> with a copy (which shall not constitute notice) to:

> Faegre Drinker Biddle & Reath LLP
> One Logan Square, Suite 2000
> Philadelphia, PA 19103-6996
> Attention: F. Douglas Raymond, Esq.
> E-mail: douglas.raymond@faegredrinker.com

If to the Buyer or the Company, to:

> JAL Equity Corp
> c/o ColorArt LLC
> 101 Workman Ave.
> Eureka, MO 63025
> Attention: Legal Department

> with a copy (which shall not constitute notice), to:

> Quarles & Brady LLP
> 8182 Maryland Avenue, Suite #405
> Clayton, MO 63105
> Attention: Mary Kate Hogan
> Email: marykate.hogan@quarles.com

**8.3    No Waiver**.  No failure or delay of any party in exercising any right, power or remedy hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or remedy hereunder or relating hereto preclude any other or further exercise thereof or the exercise of any other right, power or remedy hereunder.

**8.4    Amendments and Waivers**.  The provisions of this Agreement may be modified, amended or waived at any time only by a writing signed by (a) the Buyer, (b) the Company and (c) the Sellers, and any such modification, amendment or waiver shall be binding on each of the parties hereto.

**8.5    Choice of Law; Forum**.  This Agreement, and all claims or causes of action (whether in contract or tort) that may be based upon, arise out of or relate to this Agreement or the negotiation, execution or performance of this Agreement (including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) or the Transactions shall be governed by and construed in accordance with the laws of the State of Delaware, without regard to conflicts of laws principles.  Any proceeding arising out of or relating to this Agreement or the Transactions shall be brought only in the federal courts situated

- 48 -

in the State of Delaware.  This provision may be filed with any court as written evidence of the knowing and voluntary irrevocable agreement between the parties to waive any objections to jurisdiction, to venue or to convenience of forum.

**8.6**    **Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of the parties and their respective heirs, successors and assigns, but the rights and obligations hereunder of a party hereunder may not be assigned without the prior written consent of the other parties hereunder; *provided*, *however*, that the Buyer may (a) collaterally assign its rights under this Agreement to its lenders or (b) assign its and/or the Company's rights and/or obligations under this Agreement to any Person that acquires all or substantially all of the business or assets of the Buyer; provided that (i) the Buyer shall at all times remain fully liable hereunder notwithstanding any such assignment, and (ii) in the event of an assignment to a non-Affiliate of the Buyer, any remaining Holdback Amount (the Holdback Amount less any amounts of the Holdback Amount retained by Buyer pursuant to this Agreement, including with respect to any unresolved claims) shall be repaid in full to the Sellers' Representative on or before the consummation of such transaction.

**8.7**    **Integration; Disclosure Schedules**.

**(a)**    This Agreement and the Schedules and Exhibits hereto, together with the Transaction Documents, embody the entire agreement and understanding of the parties hereto with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings relative to such subject matter.

**(b)**    Information set forth on any Schedule hereto shall be deemed to qualify each Section of this Agreement to which such information is applicable (regardless of whether or not such Section is qualified by reference to a Schedule), so long as application to such Section is reasonably apparent on the face of such disclosure and without reference to any underlying documentation.

**8.8**    **Counterparts**.  This Agreement may be executed in two or more counterparts, and with counterpart signature pages, each of which shall be an original, but all of which together shall constitute one and the same Agreement, binding on all of the parties hereto notwithstanding that all such parties have not signed the same counterpart.  Counterpart signature pages to this Agreement transmitted by electronic mail in "portable document format" ("**.pdf**") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing an original signature.

**8.9**    **Expenses**.  Except as otherwise expressly provided herein, all legal and other costs and expenses incurred in connection with this Agreement and the Transactions shall be paid by the party incurring such costs and expenses.

**8.10**    **No Third-Party Beneficiaries**.  The Persons referenced in <u>ARTICLE VII</u> are intended third-party beneficiaries of the covenants, agreements, representations and warranties in such Sections. Except as otherwise expressly set forth in this Agreement, nothing in this Agreement will be construed as giving any third party any right, remedy or claim under or in respect of this Agreement or any provision hereof.

**8.11**    **Publicity**.  No party shall issue a press release or make any other public announcement, or provide any information to industry press, analysts or the like for purposes of publicity, concerning the Transactions without the prior written consent of the Sellers' Representative and the Buyer, except to the extent required by law, any Governmental Authority or the rules or regulations of any stock exchange or Governmental Authority, in which case the other parties hereto shall have the opportunity to review and

comment prior to disclosure; *provided*, *however*, that each party shall give reasonable prior notice to the other parties hereto of the content and timing of any such press release or other public statement required by law, any Governmental Authority or the rules or regulations of any stock exchange or Governmental Authority; provided further than nothing in this **Section 8.11** shall prevent Buyer from listing its acquisition of the Company on its website.

**8.12**    **Construction of Agreement**.

(a)    **Severability**.  If any provision of this Agreement is unenforceable or illegal, such provision shall be enforced to the fullest extent permitted by law and the remainder of the Agreement shall remain in full force and effect.

(b)    **No Strict Construction**.  The parties have participated jointly in the negotiation and drafting of this Agreement and the other agreements and documents contemplated herein.  In the event an ambiguity or question of intent or interpretation arises under any provision of this Agreement or any other agreement or documents contemplated herein, this Agreement and such other agreements or documents shall be construed as if drafted jointly by the parties thereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of authoring any of the provisions of this Agreement or any other agreements or documents contemplated herein.

(c)    **Headings**.  The headings of Articles and Sections herein are inserted for convenience of reference only and shall be ignored in the construction or interpretation hereof.

(d)    **Currency**.  Unless otherwise specified herein, any references to "dollars", "$" or other dollar amounts in this Agreement shall mean the lawful currency of United States.

(e)    **Business Days**.  Any reference to a "business day" shall mean any day except Saturday, Sunday, any statutory holiday in the State of Delaware or any other day on which the principal chartered banks in the State of Delaware are closed for business.

(f)    **Calculation of Days**.  When calculating the period of time within which or following which any act is to be done or step taken pursuant to this Agreement, the date from which such period is calculated shall be excluded.  If the last day of such period is a non-business day, the period in question shall end on the next business day.

(g)    **Knowledge**.  Any reference to "to the knowledge of the Company", "to the Company's knowledge", or any other similar phrase shall mean the actual awareness of Scott Thorell, Andrea Durloc, and William Bonner, Jr. The words "know," "knowing" and "known" shall be construed accordingly.

(h)    **Pronouns**.  All words and personal pronouns shall be read and construed as the number and gender of the party or parties referred to in each case require and the verb shall be construed as agreeing with the required word and pronoun.

(i)    **Legal Requirements and Documents**.  Unless otherwise specified, (i) any references herein to any Legal Requirement shall be construed as a reference thereto as in effect from time to time, and (ii) any reference to this Agreement or any other document is a reference to this Agreement or such other document as amended, restated and supplemented from time to time and includes all schedules and exhibits thereto.

   **(j)**  **References to this Agreement**. The words "hereof," "herein," "hereto," "hereunder," "hereby" and other similar expressions refer to this Agreement as a whole and not to any particular section or portion of it.

   **(k)**  **Including**. Where the word "including" or the word "includes" is used in this Agreement, it means "including (or includes) without limitation".

   **(l)**  **Made Available**. Where the term "Made Available" is used in this Agreement, it means, with respect to any document or information, that the same has been uploaded to the data room located at https://ws.onehub.com/workspaces/1440455/files prior to 5:00 p.m. Central time on the day that is three (3) days prior to the date of this Agreement.

   **8.13**  **Non-Recourse**. Notwithstanding anything to the contrary contained herein or otherwise, this Agreement may only be enforced against, and any claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement or the Transactions, may only be made against, the Persons that are expressly identified as parties in their capacities as parties to this Agreement, and no Non-Party shall have any liability for any obligations or liabilities of the parties or for any claim (whether in tort, contract or otherwise) based on, in respect of, or by reason of, the Transactions or in respect of any representations, warranties or statements made or alleged to be made in connection herewith. Without limiting the rights of any party against the other parties, in no event shall any party or any of its Affiliates seek to enforce this Agreement against, make any claims for breach of this Agreement against, or seek to recover monetary damages from, any Non-Party.

   **8.14**  **No Waiver of Privilege, Protection from Disclosure or Use**. The parties hereto understand and agree that nothing in this Agreement, including the foregoing provisions regarding the assertions of protection from disclosure and use, privilege and conflicts of interest, shall be deemed to be a waiver of any applicable attorney-client privilege vis a vis third parties or other protection from disclosure or use. Each of the parties understands and agrees that it has undertaken reasonable efforts to prevent the disclosure of protected communications. Notwithstanding those efforts, the parties understand and agree that the consummation of the Transactions could result in the inadvertent disclosure of information that may be confidential, eligible to be subject to a claim of privilege, or otherwise protected from disclosure. The parties further understand and agree that any disclosure of information that may be confidential, subject to a claim of privilege, or otherwise protected from disclosure will not constitute a waiver of or otherwise prejudice any claim of confidentiality, privilege, or protection from disclosure with respect to any third party, including, but not limited to, with respect to information involving or concerning the same subject matter as the disclosed information. The parties agree to use commercially reasonable efforts to return any inadvertently disclosed information to the disclosing party promptly upon becoming aware of its existence. The parties further agree that promptly after the return of any inadvertently disclosed information, the party returning such information shall use commercially reasonable efforts to destroy any and all copies, summaries, descriptions and/or notes of such inadvertently disclosed information, including electronic versions thereof, and all portions of larger documents or communications that contain such copies, summaries, descriptions or notes.

   **8.15**  **Specific Performance**. The parties agree that irreparable damage would occur if any of the provisions of this Agreement were not performed, or were threatened to be not performed, in accordance with their specific terms or were otherwise breached. Accordingly, the parties acknowledge and agree that the parties shall be entitled to seek an injunction, specific performance and other equitable relief to prevent breaches or threatened breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, this being in addition to any other remedy to which they are entitled at law or in equity.

**8.16    Legal Representation**. The Buyer hereby expressly agrees, on behalf of itself and its Affiliates and their respective current and future members, partners, equityholders, representatives and each of the successors and assigns of the foregoing (all such Persons, "**Waiving Parties**"), that Faegre Drinker Biddle & Reath LLP (or any successor thereto) may represent the Sellers or any other Person in connection with any Legal Proceeding arising in whole or in part under or in connection with this Agreement or any of the transactions contemplated herein, whether now existing or hereafter arising, and whether sounding in contract, tort or otherwise, notwithstanding its representation of the Sellers and the Company. The Buyer, on its own behalf and on behalf of the Waiving Parties, hereby consents thereto and irrevocably waives (and shall not assert) any conflict of interest or any objection arising therefrom or relating thereto; *provided*, *however*, that the foregoing provision shall not apply if Faegre Drinker Biddle & Reath LLP is providing ongoing legal services to the Buyer or its Affiliates after the Closing Date.

**8.17    Attorney-Client Privilege**. Notwithstanding anything to the contrary in this Agreement, as to all communications between Faegre Drinker Biddle & Reath LLP and the Sellers and the Company relating to this Agreement or the transactions contemplated herein, the attorney-client privilege and the expectation of client confidence belongs to the Sellers, shall be controlled by the Sellers and shall not pass to or be claimed by the Buyer or its Affiliates. The Buyer shall not assert or use privileged communications with Faegre Drinker Biddle & Reath LLP for the purpose of asserting, prosecuting, or litigating any claim for Losses against the Sellers. Notwithstanding the foregoing provisions of this Section 8.17, if a dispute arises between a Seller, the Buyer or any of their Affiliates and a third party other than a party to this Agreement after the Closing, such Seller and the Company may assert the attorney-client privilege to prevent disclosure of confidential communications to such third party.

**8.18    Further Assurances**. Each party shall do and perform, or cause to be done and performed, all such acts and things, and shall execute and deliver such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

[Signature page follows.]

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as of the date first above written.

**BUYER**:

**JAL EQUITY CORP**

By: _____
    Name: Eran Salu
    Title: President

**KAPPA GRAPHICS**:

**KAPPA GRAPHICS, LLC**

By:_____
    Name:
    Title:

**KPFS**:

**KAPPA        PRODUCT        FULFILLMENT
SERVICES, LLC**

By:_____
    Name:
    Title:

**SELLERS**:

**KGR HOLDINGS, LLC**

By:_____
    Name:
    Title:

**KPF HOLDINGS, LLC**

By:_____
    Name:
    Title:

[Signature Page to Equity Purchase Agreement]

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as of the date first above written.

**BUYER:**

**JAL EQUITY CORP**

By: _____
Name: Eran Salu
Title: President

**KAPPA GRAPHICS:**

**KAPPA GRAPHICS, LLC**

By: _____
Name: Andrea Duloc
Title: Vice President

**KPFS:**

**KAPPA    PRODUCT    FULFILLMENT SERVICES, LLC**

By: _____
Name: William J. Bonner, Jr.
Title: Vice President

**SELLERS:**

**KGR HOLDINGS, LLC**

By: _____
Name: Andrea Duloc
Title: Manager

**KPF HOLDINGS, LLC**

By: _____
Name: Despina McNulty
Title: Manager

[Signature Page to Equity Purchase Agreement]

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as of the date first above written.

**BUYER:**

**JAL EQUITY CORP**

By: _____
    Name: Eran Salu
    Title: President


**KAPPA GRAPHICS:**

**KAPPA GRAPHICS, LLC**

By: _____
    Name: Andrea Duloc
    Title: Vice President

**KPFS:**

**KAPPA    PRODUCT    FULFILLMENT SERVICES, LLC**

By: _____
    Name: William J. Bonner, Jr.
    Title: Vice President

**SELLERS:**

**KGR HOLDINGS, LLC**

By: _____
    Name: Andrea Duloc
    Title: Manager

**KPF HOLDINGS, LLC**

By: _____
    Name: Despina McNulty
    Title: Manager


[Signature Page to Equity Purchase Agreement]

IN WITNESS WHEREOF, the undersigned have caused this Agreement to be executed as of the date first above written.

**BUYER:**

**JAL EQUITY CORP**

By: _____
      Name: Eran Salu
      Title: President

**KAPPA GRAPHICS:**

**KAPPA GRAPHICS, LLC**

By: _____
      Name: Andrea Duloc
      Title: Vice President

**KPFS**:

**KAPPA    PRODUCT    FULFILLMENT
SERVICES, LLC**

By: _____
      Name: William J. Bonner, Jr.
      Title: Vice President

**SELLERS**:

**KGR HOLDINGS, LLC**

By: _____
      Name: Andrea Duloc
      Title: Manager

**KPF HOLDINGS, LLC**

By: _____
      Name: Despina McNulty
      Title: Manager

[Signature Page to Equity Purchase Agreement]

OWNER:

**ESTATE OF NICHOLAS G. KARABOTS**

By: _____
Despina McNulty, Executor

By: _____
Andrea Duloc, Executor

By: _____
William J. Bonner, Jr., Executor

By: _____
Constance Kolkka, Executor

[Signature Page to Equity Purchase Agreement]

**Exhibit A**

Sample Closing Net Working Capital Calculation

| Entity | Account Name | Jan-24 | Adj. | Adj. NWC | Comments |
|---|---|---|---|---|---|
| KG | Accounts Receivable | 2,295,054 | (261,475) | 2,033,579 | Based on 2/26. If there are greater than 90 day balances (besides the Roaderlink $21,750) in the final aging, then we will adjust those out accordingly. There were no other >90 day balances as of the 2/26 aging provided. Intercompany Kappa amounts excluded, although there are none in the aging provided for 2/26. |
| KG | Material And Supplies | 38,975 | | 38,975 | Based on 1/31 balance |
| KG | Paper Inventory | 419,417 | (277,825) | 141,592 | Based on 2/23. Removed items aged >12 months. Adjusted C1S Crownboard Prestige to a 25% rather than 100% discount due to obsolete inventory, as there will be additional work to make it usable at a different paper size. |
| KG | Work In Process | 139,758 | (26,637) | 113,121 | Based on 2/24 |
| KG | Prepaid Expenses | 88,055 | (73,055) | 15,000 | Used Scott's estimate. Insurance that will be refunded to a Kappa bank account (becoming Buyer funds) will be included in the true up. |
| KPF | Accounts Receivable | 523,450 | (89,449) | 434,001 | Based on 2/26. If there are greater than 90 day balances in the final aging, then we will adjust those out accordingly. There were no other >90 day balances as of the 2/26 aging provided. Intercompany Kappa amounts excluded, although there are none in the aging provided for 2/26. |
| KPF | Prepaid Expenses | - | | - | |
| | Total Current Assets | 3,504,709 | (728,441) | 2,776,268 | |
| KG | Accounts Payable | 1,197,588 | (584,568) | 613,020 | Based on 2/26 AP aging + $40k estimated unentered AP per Management. Intercompany KPF amounts will be excluded if on the books at closing. Spartan, Glenti, other related parties and transaction expenses will be settled by Seller prior to closing or will be Seller's responsibility after closing. |
| KG | Deferred Revenue | - | | - | |
| KG | Payroll Taxes | 7,889 | 7,639 | 15,529 | Adjusted to include pro-rata % on the payroll adjustment below. Adjusted to match the check total for 3/1 pay day (i.e. pay period ending 2/25) + 4/5ths of that amount to account for the Mon-Thurs work as of 2/29 |
| KG | Accrued Payroll | 40,459 | 123,231 | 163,690 | Adjusted to 1 week + 4/5th of a week to account for Thursday expected unpaid accrual. Adjusted to match the check total for 3/1 pay day (i.e. pay period ending 2/25) + 4/5ths of that amount to account for the Mon-Thurs work as of 2/29 |
| KG | Accrued Expenses | 285,569 | (246,759) | 38,810 | Removed 401k as the liability will be removed off the books prior to close as Seller liability. Also moved accrued vacation below for ease. |
| KG + KPF | Accrued Vacation | | 235,787 | 235,787 | |
| KPF | Accounts Payable | 179,553 | (102,428) | 77,126 | Based on 2/26 AP aging, less amounts due to KG + Spartan as they will be settled prior to close or are intercompany related |
| KPF | Payroll Taxes | 1,476 | 252 | 1,728 | Adjusted to include pro-rata % on the payroll adjustment below. Adjusted to match the check total for 3/1 pay day (i.e. pay period ending 2/25) + 4/5ths of that amount to account for the Mon-Thurs work as of 2/29 |
| KPF | Accrued Payroll | 3,743 | 11,342 | 15,085 | Adjusted to 1 week + 4/5th of a week to account for Thursday expected unpaid accrual. Adjusted to match the check total for 3/1 pay day (i.e. pay period ending 2/25) + 4/5ths of that amount to account for the Mon-Thurs work as of 2/29 |
| KPF | Accrued Expenses | 2,246 | | 2,246 | |
| KG + KPF | Accrued Other Taxes | - | | - | Per Seller, there are no other taxes that should be accrued / were incurred prior to close other than payroll taxes |
| | Total Current Liabilities | 1,718,524 | (555,503) | 1,163,021 | |
| | **Net Working Capital** | **1,786,185** | **(172,938)** | **1,613,247** | |

**<u>Exhibit B</u>**

Earn-Out Terms

See attached.

*EXECUTION VERSION*

## EXHIBIT B

### EARN-OUT TERMS

1.1    <u>Definitions</u>.  Capitalized terms used but not defined herein shall have the meanings set forth in the Agreement.  The following terms used in this <u>Exhibit B</u> shall have the meanings set forth below in this <u>Section 1.1</u>:

"<u>Acceleration Event</u>" means a direct or indirect sale or transfer (in a single transaction or through a series of related transactions) to any third party (other than an affiliate of Buyer) of (i) securities representing greater than 50% of the outstanding voting power, or economic interest in Buyer or the Company (whether by way of a sale of securities, merger or otherwise), provided that a sale of the securities of the Company to any subsidiary of Buyer shall not be considered an Acceleration Event hereunder, (ii) more than sixty percent (60%) of the printing revenue of the Buyer or printing-related assets of Buyer, measured by the last twelve months' revenues, or (iii) more than sixty percent (60%) of the assets of the Company or, in the event the Buyer or an Affiliate of Buyer acquires the Craftline Assets within two (2) months of the Closing Date, of the Craftline Assets, in each case measured by the last twelve months' revenues prior to the Closing Date.

"<u>Combined Business</u>" means (i) in the event that Buyer or an Affiliate of Buyer acquires the assets of Craftline Graphics, Inc. and Craftline Fulfillment & Distribution, LLC (the "<u>Craftline Assets</u>") within two (2) months of the Closing Date, then the aggregate Business and the business of operating the Craftline Business, as operated by Buyer or its Affiliate, or (ii) in the event that neither Buyer nor an Affiliate of Buyer acquires the Craftline Assets within two (2) months of the Closing Date, then the Business.

"<u>Earn-Out Cap</u>" means (i) in the event that Buyer or an Affiliate of Buyer acquires the Craftline Assets within two (2) months of the Closing Date, One Million Dollars ($1,000,000), or (ii) in the event that neither Buyer nor an Affiliate of Buyer acquires the Craftline Assets within two (2) months of the Closing Date, Six Hundred Thousand Dollars ($600,000).

"<u>Earn-Out Payment</u>" means each payment made to Sellers for any Earn-Out Year pursuant to the terms and conditions of this <u>Exhibit B</u>.

"<u>Earn-Out Period</u>" means Earn-Out Year 1 and Earn-Out Year 2, collectively.

"<u>Earn-Out Year</u>" means each of Earn-Out Year 1 and Earn-Out Year 2.

"<u>Earn-Out Year 1</u>" means the twelve (12) month period starting on (i) in the event that Buyer or an Affiliate of Buyer acquires the Craftline Assets within two (2) months of the Closing Date, then the first day of the first full calendar month following the closing date of such acquisition, or (ii) in the event that neither Buyer nor an Affiliate of Buyer acquires the Craftline Assets within two (2) months of the Closing Date, then the first day of the first full calendar month following the Closing Date.

"Earn-Out Year 2" means the twelve (12) succeeding months after the end of Earn-Out Year 1.

"Maximum" means (i) in the event that Buyer or an Affiliate of Buyer acquires the Craftline Assets within two (2) months of the Closing Date, Five Hundred Thousand Dollars ($500,000), or (ii) in the event that neither Buyer nor an Affiliate of Buyer acquires the Craftline Assets within two (2) months of the Closing Date, Three Hundred Thousand Dollars ($300,000).

"Milestone" means that, for Earn Out Year 1, the Combined Business has Sales that exceed the applicable Threshold.

"Sales" means revenue, as calculated in accordance with GAAP, from sales of the Combined Business to the Combined Business's current customers and prospects which are set forth on Attachment 1 hereto, as well as future customers sourced primarily by employees that are allocated to the Combined Business (collectively, the "Earn-Out Customers"), provided that notwithstanding the foregoing, such calculation will exclude sales to customers and prospects of Buyer and its Affiliates (other than the Earn-Out Customers); provided further that such calculation will exclude all scrap and recycling sales. For the avoidance of doubt, no Sales will be duplicated or double counted, including in the event that any products are sold to a third party which are then sold to an end user who is also considered a customer or prospect of such entity.

"Threshold" means (i) in the event that Buyer or an Affiliate of Buyer acquires the Craftline Assets within two (2) months of the Closing Date, Forty-Six Million Dollars ($46,000,000), or (ii) in the event that neither Buyer nor an Affiliate of Buyer acquires the Craftline Assets within two (2) months of the Closing Date, Sixteen Million Dollars ($16,000,0000).

1.2    Earn-Out Payments.

(a)    The Earn-Out Payment for Earn-Out Year 1, if any, is payable to Sellers' Representative (on behalf of the Sellers) in accordance with Section 1.5 and as follows: if the Sales of the Combined Business meets the Milestone during Earn-Out Year 1, then Buyer shall pay an Earn-Out Payment equal to Five Tenths (0.5) multiplied by the amount by which the Sales exceed the applicable Threshold, up to the applicable Maximum.

(b)    The Earn-Out Payment for Earn-Out Year 2, if any, is payable to Sellers' Representative (on behalf of the Sellers) in accordance with Section 1.5 and as follows: if the Sales of the Combined Business meets the Milestone during Earn-Out Year 2, then Buyer shall pay an Earn-Out Payment equal to Five Tenths (0.5) multiplied by the amount by which the Sales exceed the applicable Threshold, up to the applicable Maximum; provided that if the applicable Maximum is not earned in Earn-Out Year 1, the applicable Maximum for Earn-Out Year 2 shall be increased by an amount equal to the Maximum minus the amount of the Earn-Out Payment made for Earn-Out Year 1, if any. For example, if the applicable Maximum is $250,000, and the Sellers earn an Earn-Out Payment for Earn-Out Year 1 of $100,000, then the Maximum for Earn-Out Year 2 shall be $400,000 (calculated as the applicable Maximum for Earn-Out Year 2 ($250,000) + (the applicable Maximum for Earn-Out Year 1 ($250,000) - Earn-Out Payment for Earn-Out Year 1 ($100,000)).

2

(c)     For the avoidance of doubt, Buyer shall not be obligated or liable to pay any amounts under this Exhibit B in excess of, and the aggregate Earn-Out Amount shall not exceed, the Earn-Out Cap.

1.3     Earn-Out Determinations; Notice of Achievement.

(a)     Promptly after the Closing, Buyer shall designate one or more business executives of Buyer to represent Buyer in making the determinations set forth in this Exhibit B (the "Buyer Earn-Out Representative").  Buyer may alter its designation of the Buyer Earn-Out Representative at any time and from time to time, on written notice to the Sellers' Representative. Within sixty (60) calendar days of the end of each of Earn-Out Year 1 and Earn-Out Year 2, the Buyer Earn-Out Representative will deliver a written statement to the Seller Earn-Out Representative (as defined below) providing a statement as to whether the Year 1 Milestone or the Year 2 Milestone, as applicable, was achieved and the resulting Earn-Out Payment to be paid, if any (each, a "Determination").

(b)     Promptly after the Closing, the Sellers' Representative shall designate one representative to represent the Sellers in connection with any Determination and any disputes in connection therewith (the "Seller Earn-Out Representative"). Sellers' Representative may alter their designation of the Seller Earn-Out Representative at any time and from time to time, on written notice to Buyer.

(c)     Each of Buyer, Sellers, and Sellers' Representative (on behalf of the Sellers) agrees to cause their respective representatives and Affiliates to reasonably cooperate and assist in the review and determinations required under this Section 1.3, including, but not limited to, providing reasonable access during normal business hours to the records, work papers and computations used by Buyer in the preparation of a Determination, *provided* that such access does not interfere unreasonably with the day to day operations of Buyer.

(d)     Any disagreement or dispute between the parties arising out of or relating to the determination procedures set forth in this Section 1.3, shall be subject to the dispute resolution procedures set forth in Section 1.4 of this Exhibit B below.

1.4     Earn-Out Dispute Resolution.

(a)     Notwithstanding anything in the Agreement to the contrary, any dispute arising out of or relating to this Exhibit B (an "Earn-Out Dispute"), shall be resolved in accordance with the procedures specified in this Section 1.4 which shall be the sole and exclusive procedures for the resolution of any such Earn-Out Disputes.

(b)     If the Sellers' Representative disputes any amounts reflected on a Determination as delivered by Buyer, the Seller Earn-Out Representative shall so notify the Buyer Earn-Out Representative in writing ("Notice of Earn-Out Dispute") not more than thirty (30) calendar days after the date the Buyer Earn-Out Representative delivers a Determination, specifying in reasonable detail the points of disagreement (any such disagreement hereinafter, an "Earn-Out Disagreement").  If the Seller Earn-Out Representative fails to deliver a Notice of Earn-Out Dispute within such thirty (30) calendar day period, the Sellers shall be deemed to have accepted the Determination (and all amounts and calculations set forth thereon) and the

3

Determination as originally delivered by Buyer (and all such amounts and calculations) shall be final, binding and non-appealable by the parties. If a Notice of Earn-Out Dispute is timely delivered, Seller Earn-Out Representative and Buyer Earn-Out Representative shall negotiate in good faith to resolve any Earn-Out Disagreement. If any such Earn-Out Disagreement is not resolved by Buyer Earn-Out Representative and Seller Earn-Out Representative in writing within thirty (30) calendar days after Buyer Earn-Out Representative receives the Notice of Earn-Out Dispute, either party may exercise its remedies in accordance with <u>Section 8.5</u> of the Agreement.

    1.5   <u>Payment of Earn-Out</u>. For the Earn-Out Period, any Earn-Out Payment required to be made by Buyer pursuant to <u>Section 1.2</u> shall be made by wire transfer of immediately available funds to an account or accounts designated in writing by the Sellers' Representative (on behalf of the Sellers) not later than two (2) Business Days prior to such payment, as follows:

    (a)   commencing ninety (90) calendar days after the end of Earn-Out Year 1, the Earn-Out Payment for Earn-Out Year 1, if any, shall be paid to Sellers' Representative (on behalf of the Sellers) in four (4) quarterly payments; provided, that in the event that the Earn-Out Payment for Earn-Out Year 1 has not been finally determined in accordance with the terms hereof prior to such date because of a good faith dispute between the parties, then such four (4) quarterly payments shall commence on the date that is thirty (30) calendar days following such final determination of the Earn-Out Payment for Earn-Out Year 1; and

    (b)   commencing ninety (90) calendar days after the end of Earn-Out Year 2, the Earn-Out Payment for Earn-Out Year 2, if any, shall be paid to Sellers' Representative (on behalf of the Sellers) in four (4) quarterly payments; provided, that in the event that the Earn-Out Payment for Earn-Out Year 2 has not been finally determined in accordance with the terms hereof prior to such date because of a good faith dispute between the parties, then such four (4) quarterly payments shall commence on the date that is thirty (30) calendar days following such final determination of the Earn-Out Payment for Earn-Out Year 2.

In the event that Buyer does not provide the Determination to Sellers' Representative within sixty (60) calendar days of the end of each of Earn-Out Year 1 and Earn-Out Year 2, then Sellers' Representative shall provide written notice to Buyer of its failure to provide the Determination. If Buyer does not deliver the Determination to Sellers' Representative within ten (10) business days of receipt of such written notice, then the maximum Earn-Out Payment for such Earn-Out Year shall be deemed to be earned, and Buyer shall commence payment of such Earn-Out Payment in four (4) quarterly payments commencing on the date that is ten (10) business days following the date that such Earn-Out Payment is deemed earned.

    1.6   <u>Confidentiality</u>

    (a)   The parties and the representatives referenced herein shall not use or disclose any information or communications shared or exchanged between or among Buyer, the Buyer Earn-Out Representative, the Seller Earn-Out Representative, the Sellers, the Sellers' Representative, or any other representatives or agents of any party with respect to or in connection with the matters set forth in this <u>Exhibit B</u>, including (i) any Determination and (ii) the content of any discussions occurring at, and any information exchanged in connection with, any dispute resolution communications pursuant to <u>Section 1.4</u> of this <u>Exhibit B</u>, to any Person except its

4

representatives and agents assisting or representing such party in connection with the meetings and proceedings held pursuant to <u>Section 1.4</u> of this <u>Exhibit B</u> (<u>provided</u> that such representatives or agents shall have been advised of the terms of this <u>Section 1.6(a)</u> and agreed to be bound hereby and that each party shall be liable for any breach hereof by its representatives or agents) and in accordance with the Agreement and this <u>Exhibit B</u>.

(b)    The parties acknowledge and agree that in the event of any breach of this <u>Section 1.6</u>, the harm to the parties will be irreparable and without adequate remedy at law and therefore that injunctive relief with respect thereto will be appropriate.

1.7    <u>Seller Parties' Acknowledgement</u>. The Sellers understand and acknowledge that control of all business decisions of Buyer and its Affiliates, including with respect to the Company and the Combined Business (including, without limitation, sales and marketing, capital expenditures, product pricing, product development, product deployment, employee hiring and retention, subcontracting authority, facilities management and acquisitions or dispositions of assets (and the timing thereof)), from and after the Closing shall be the ultimate right of Buyer, and that Buyer may operate its business, the Combined Business, and the business of its Affiliates in the manner it deems appropriate in its sole and absolute discretion regardless of whether, or to what extent, any action or inaction whatsoever on the part of Buyer, may have an effect on, or may increase or decrease, the likelihood, possibility, or amount of any Earn-Out Payment payable to Sellers hereunder, and Sellers shall not have any claim whatsoever against Buyer that, absent any action or inaction whatsoever on the part of Buyer in its conduct of the Combined Business or operation of Buyer or its Affiliates, any Earn-Out Payment would have been earned or would have been more than earned. Sellers expressly acknowledge and agree that they shall have no claim hereunder except for payment of an Earn-Out Payment if and when the same may be due and owing under the express terms and conditions set forth herein. Sales shall include Sales of the Earn-Out Customers by Buyer and its Affiliates regardless of the specific location where the orders of such customers may be processed or printed.

1.8    <u>Set-Off Rights</u>.

(a)    Notwithstanding any provision of this Agreement to the contrary, the parties hereby acknowledge and agree that, in addition to any other right hereunder, Buyer shall have the right, but not the obligation, from time to time to withhold and/or set off against any Earn-Out Payment required to be paid by Buyer to Sellers pursuant to this <u>Exhibit B</u> any amounts owed at such time by Sellers to Buyer (or any of its Affiliates) under the Agreement, including (and subject to) <u>Article 7</u> of the Agreement.

(b)    In the case of any such set-off by Buyer pursuant to this <u>Section 1.8</u>, Sellers' obligation to make such payment (or any portion thereof) shall be deemed satisfied and discharged to the extent of such set-off.  The exercise of such right of set-off by Buyer in good faith, whether or not finally determined to be justified, will, subject to Section 7.10 of the Agreement, not constitute a breach under the Agreement.

1.9    <u>Acceleration</u>.  In the event of any Acceleration Event during the Earn-Out Period, Buyer shall pay to Sellers' Representative (on behalf of the Sellers), within thirty (30) calendar

days of such Acceleration Event, the amount equal to the Earn-Out Cap less the aggregate of any previously paid Earn-Out Payments, if any.

      1.10   <u>Tax Treatment</u>.  Buyer and Sellers do not intend the Agreement and the payment obligations hereunder to create a partnership or joint venture for Tax purposes.  Buyer and Sellers agree to treat any Earn-Out Payments made to Sellers as additional consideration for the acquisition of the Purchased Securities pursuant to the Agreement, and each of Buyer and Sellers shall report these payments as such on their respective Tax Returns (unless otherwise required by applicable law).

QB\87304167.6

**Attachment 1**

Current Customers and Prospects of Sellers and Affiliates

- The following customers, including any affiliates or subsidiaries thereof:

    o Kappa Publishing / Keesing

    o Kappa Books / Keesing

    o PAPP INTERNATIONAL INC

    o READERLINK DISTRIBUTION SERVICES, LLC

    o KETCHMAN WOLF

    o Penny Publications (Penny/Dell)

    o JFL DISTRIBUTION

    o Bendon

    o Chicken Soup for the Soul

    o LeapYear Publishing

    o CrownJewlz

    o Printers Row

    o A360 Media (Bauer Media Group was acquired by A360 Media)

    o Telegraph Road Entertainment

    o Pyramid Publications

    o School Zone Publishing Company

    o Flower Pot Press

    o Hinkler Books

    o AM Production

    o Shipcor LLC

    o Vision Street Publishing

    o In the event that neither Buyer nor an Affiliate of Buyer acquires the Craftline Assets within two (2) months of the Closing Date, then Craftline